OPINION OF THE COURT
Bernard M. Bloom, S.
This is a proceeding instituted by Kye Suk Brown as executrix under the will of her purported husband, for a decree adjudging the invalidity of a right of election asserted by respondent, Dosie Mae Brown.
A hearing on the matter was held before a senior law assistant-referee at which time it was established that decedent and respondent were married in Mississippi in 1934 and moved to this State in 1946, accompanied by the children that had been born to them. Shortly thereafter, Mr. Brown became a civilian employee of the United States Government abroad. After his initial assignment in Japan, he transferred in 1952 to Korea, where he worked at the Army’s post exchange in Seoul. In 1961, after having worked there for some 8 to 9 years, during which time his visits to see his family were exceedingly few and far between, he filed for divorce in a division of the District Court of Seoul.
Some months later, a three-Judge panel issued its decision setting forth in detail the evidence that had been presented and finding thereon that Dosie Mae Brown had been guilty of marital fault, including the squandering of support moneys and threats of divorce and of bodily harm, which was deemed sufficiently destructive of their relationship to entitle the plaintiff to a dissolution of their marriage. The decree was signed on January 26, 1962 and became final, no appeal having been taken, on February 10, 1962.
Dosie Mae Brown did not appear in the proceeding either in person or by attorney despite the fact, according to petitioner here, that notices of the commencement and progress of the foreign action were directed to her. Respondent acknowledges that on perhaps three occasions around the time in question, papers written entirely in oriental characters that she took to be in the Chinese or Korean language were brought to her home. The first of these (which, presumably, consisted of the *813 summons in the action which is recited in the court’s decision to have been delivered to her) she took to an office of the Legal Aid Society, where an attorney reportedly told her that legal papers in a foreign language unknown to her could safely be ignored but, nevertheless, advised her to refuse to accept service of any other such document in the future. Although she states that she followed the advice she had been given and never obtained a translation, she surmised the subject matter because her husband’s mother had told her beforehand that he planned to seek a divorce.
On March 5, 1962, a vice-consul of the United States performed a ceremony at the Mayor’s office of the City of Seoul ostensibly uniting Matthew J. Brown and petitioner, Kye Suk Brown, in wedlock after having been apprised that the groom’s previous marriage to Dosie Mae Brown had been declared terminated by decree of a local court. A daughter, Juliana Brown, was born the following year, who would prove to be the sole child of their union.
It was not until 1968 that decedent and his second family left Korea bound for Bangkok, the final post of his foreign service career. Upon his retirement two years later, he joined Kye Suk Brown and their daughter, who had been admitted to this country the previous year.
On October 31, 1979, he executed the testamentary instrument later admitted to probate by this court in which he bequeathed his entire estate to Kye Suk Brown, whom he identified as his wife. Mention was made therein of respondent both by name and by description as his "former wife” in a clause the purpose of which was to expressly exclude her and any of his children from taking any share of his estate except Juliana, who was named sole legatee in the event that her mother should predecease him.
Dosie Mae Brown maintains on several grounds that she remained Matthew J. Brown’s lawful wife until his death on October 15, 1982 and is thus entitled to her elective share of his estate. She contends that the Republic of Korea was without power to adjudicate the marital status of an American citizen in the employ of his government such as her husband and, in any case, that the decree of divorce is void as against her because she was not served personally with process within the jurisdiction of the court nor did she submit to its jurisdiction or acquiesce in the court’s judgment and that such service as was made upon her consisting of documents in *814 a foreign language which she was unable to understand was inadequate.
The petitioner, for her part, argues that the Korean decree meets the established tests for recognition by this State and, in the alternative, that respondent is equitably estopped from raising its invalidity by reason of her failure to seek a declaratory judgment or to use any other available avenue to vindicate her supposed rights in the more than 20 years that elapsed between the date of the judgment and decedent’s death.
It is well established in American law that, subject to possible obligations imposed by treaty between the United States and a foreign power, there is no constitutional obligation upon a State to recognize a judgment rendered by a court of another nation. But, with due regard to international duty and convenience, and the sense that respect is due to the judicial act of another sovereign, comity, that is, voluntary deference, is customarily accorded to the foreign decree to the extent that it is enforceable in the country which rendered it, provided that in the foreign tribunal there was a jurisdictional predicate in the procedural due process sense and that the public policy of the particular State is not thereby contravened. Should the decree fail to meet these criteria, it will not be recognized as such. Nevertheless, in the divorce context, a spouse at whose behest or with whose connivance or acquiescence the decree was procured may be equitably estopped from attacking it, as may even one aggrieved by it whose subsequent conduct induced the other to change his or her position in reliance thereon. (See generally, 1 Foster-Freed, Law and the Family §§ 9:20, 9:24 [1972]; Juenger, Recognition of Foreign Divorces — British and American Perspectives, 20 Am J Comp L 1 [1972]; 24 Am Jur 2d, Divorce and Separation, §§ 1104, 1106-1109; 48 NY Jur 2d, Domestic Relations, §§ 1484-1490.)
No treaty in force between the United States and the Republic of Korea has any bearing on the case at bar.
With respect to the laws of Korea pertaining to the acquisition of a jurisdictional predicate over proceedings for divorce, no direct proof was offered and the decision of the foreign court does not, in so many words, set forth such jurisdictional predicate. But as it plainly recites that the spouses had been married in the United States, that each remained a citizen thereof, that the petitioner husband’s presence in Korea was *815 occasioned by his employment as a civilian attached to an American military base and that the defendant wife resided at a certain Brooklyn, New York, address where process in the action had been served, it can fairly be inferred that none of those facts precluded entertainment of the action as a matter of Korean law. Presumably, a prospective plaintiffs domicile, or, as is more likely given the fact that domicile is a notion of the common law not widely shared around the world (Juenger, op. cit., at 19), residence, within the domain for some length of time was deemed sufficient to invoke its courts’ authority and that it was on such basis that an action to terminate decedent’s marriage to Dosie Mae Brown was accepted.
Our concept of "domicile”, of course, signifies the place where one has his true, fixed and permanent home and to which, whenever absent, he has the intention of returning and from which he has no present intention of moving. (25 Am Jur 2d, Domicil, § 1 [1966].) The term "residence” is less inclusive, importing merely having an abode at a particular place which may be one of any number of such places at which one is, at least from time to time, physically present. Thus, residence, together with the requisite intent, is necessary to acquire domicile, but actual residence is not necessary to preserve a domicile once it has been acquired. (Id., § 4.)
Domicile has often been spoken of by American courts as if it were the sine qua non of jurisdiction to hear proceedings for the termination of marriage. (See, e.g., Sosna v Iowa, 419 US 393 [1975]; Rice v Rice, 336 US 674 [1949]; Sherrer v Sherrer, 334 US 343 [1948]; Williams v North Carolina, 325 US 226 [1945]; Bell v Bell, 181 US 175 [1901]; Atherton v Atherton, 181 US 155 [1901].) Typical of such expressions is that of Justice Frankfurter for the court in Williams v North Carolina: "Under our system of law, judicial power to grant a divorce — jurisdiction, strictly speaking — is founded on domicil. Bell v. Bell, 181 U. S. 175; Andrews v. Andrews, 188 U. S. 14. The framers of the Constitution were familiar with this jurisdictional prerequisite, and since 1789 neither this Court nor any other court in the English-speaking world has questioned it. Domicil implies a nexus between person and place of such permanence as to control the creation of legal relations and responsibilities of the utmost significance. The domicil of one spouse within a State gives power to that State, we have held, to dissolve a marriage wheresoever contracted.” (325 US, at pp 229-230.)
It is difficult to reach a confident conclusion whether the *816 decedent had acquired a true domicile in Korea at the time that he filed for divorce there. On the one hand, Seoul had undoubtedly been his principal place of residence for several years, a presence seldom interrupted, as respondent admits, by return trips to Brooklyn. Soon after the decree had been obtained, he came back to sell the house which he had bought for her occupancy several years earlier. For some 5 or 6 years more, he continued to live in Seoul, years which were spent in the company of the petitioner, who had been born there, and, in time, their child, a natural-born citizen of Korea. On the other hand, there is merit to the argument that the proper inference from the record is that he lived abroad only because that it is where his job required him to be, as witnessed by his earlier service in Japan and later move to Thailand, all the while intending to return eventually to Brooklyn, which he did, in fact, do after retiring. Moreover, on his affidavit of eligibility to marry the petitioner he gave the address of the as yet unsold house in Brooklyn as his "current legal address”.
Doubt as to whether he was a domiciliary or only a resident of Korea at the time the decree was issued, however, does not end the inquiry whether a sufficient basis or predicate of jurisdiction existed to permit the Korean court to affect the matrimonial status. Despite the oft-repeated pronouncements of our courts, notably our highest, that the presence of the domicile of at least one party to the marriage within the State is the basis upon which adjudicatory jurisdiction rests, analysis reveals that the United States Supreme Court has never squarely held that it is an absolute prerequisite to a valid judgment. In actuality, references to the essentiality of domicile were made by way of affirming the freedom of a State which has an interest in the marriage, whether because it had been the matrimonial domicile or merely the State of the spouse against whom an out-of-State decree had been obtained ex parte, to look behind a sister State’s decree and refuse to grant it effect, notwithstanding the full faith and credit clause (US Const, art IV, § 1), if a bona fide domicile had not been established. Commentators have criticized the supposed domicile requirement, noting that the concept of in rem jurisdiction upon which it is based (which makes use of the legal fiction that the marital status is a res having its situs at the matrimonial domicile, or if the spouses are separated and living in different jurisdictions, at their individual domiciles) is an outmoded one which has been superseded by a more *817 modern theory of juridical power. (See, e.g., Juenger, op. cit.; Foster, Recognition of Migratory Divorces: Rosenstiel v Section 250, 43 NYU L Rev 429 [1968]; Parsons, The Divisible Divorce Doctrine Reexamined in Light of Shaffer v Heitner, 51 Miss LJ 801 [1981].) The breakdown of the substantial consensus as to the domicile requirement is evidenced by the enactment in several States of laws authorizing the granting of divorce relief to military personnel who have been continuously stationed in the State for a given period, usually a year. Noting that such statutes have "invariably” been upheld against challenge, and anticipating that the Supreme Court of the United States will similarly approve this and other jurisdictional bases when called upon the decide the question, the authors of the Restatement have adopted an article on conflicts of law which reads as follows:
"§ 72. State of Domicil of Neither Spouse
"A state has power to exercise judicial jurisdiction to dissolve the marriage of spouses, neither of whom is domiciled in the state, if either spouse has such a relationship to the state as would make it reasonable for the state to dissolve the marriage.” (Restatement [Second] of Conflict of Laws § 72 [1971].)
The concept that bases of jurisdiction other than domicile can be used is nothing new to this State. Domestic Relations Law former § 170 (repealed by L 1966, ch 254) which provided, without reference to domicile, that an action for divorce could be maintained by either spouse if the marriage had been solemnized in this State, dated from 1862. (David-Zieseniss v Zieseniss, 205 Misc 836 [Sup Ct, NY County 1954].) Indeed, among the American States, New York historically took a minority approach by deemphasizing domicile and instead concerning itself primarily with the ex parte or bilateral procurement of the decree, displaying quite extraordinary liberality with the former and precious little with the latter. (See, Foster, op. cit., at 433-437.)
In Gould v Gould (235 NY 14 [1923]), the Court of Appeals extended comity to a decree of the Republic of France purporting to dissolve the marriage of a couple resident there who were New York domiciliaries and American citizens. The French court, in an action in which both spouses took part, had expressly applied the law of their domicile and found that adultery, the sole ground then provided in New York to obtain an absolute divorce, had been established. Even though it be *818 assumed that effect need not be given to the foreign judgment, reasoned the court unanimously, there was no prohibition against doing so where recognition, in conformity with the principle of comity, would not offend this State’s public policy. Opinion was reserved as to whether that policy would have been contravened had the French judgment disclosed that the spouses were merely sojourning in France at the time that the divorce was granted or that their residence there was of such limited duration as to lead to the belief that it was the result of collusion or the judgment had been rendered for a cause other than the lone ground regarded as sufficient under the law of New York.
Lower courts followed suit. (See, Martens v Martens, 260 App Div 30 [1st Dept], revd on other grounds 284 NY 363 [1940], rearg denied 285 NY 607 [1941]; Oettgen v Oettgen, 196 Misc 937 [Sup Ct, NY County 1949]; cf. Karfiol v Karfiol, 277 App Div 866 [1st Dept 1950].)
Gould (supra) was slightly expanded when, in Arpels v Arpels (8 NY2d 339 [1960]), the Court of Appeals refused the wife’s plea to enjoin her husband from the continued conduct of a divorce proceeding in France despite the claim that they were both New York domiciliaries and the additional fact that the wife had not responded to substituted service made upon her while she was in France. The court ventured to say that France, where the husband was a resident if not actually domiciled and the wife was a frequent visitor, appeared to have jurisdiction to dissolve the marriage and that an ensuing decree would probably be deserving of comity if granted on the ground of adultery.
Nevertheless, the only two reported decisions found in which a court of this State has been required to consider the effect of a foreign decree of divorce rendered ex parte against a New York domiciliary with no past or present tie to the foreign jurisdiction, as was Dosie Mae Brown, both resulted in a refusal to grant comity to Mexican decrees. In Carbone v Carbone (166 Misc 924 [Dom Rel Ct, Bronx County 1938]), the decision was put upon the basis that although insofar as was shown by the proof the plaintiff in the foreign proceeding had not gone to Mexico for the purpose of instituting a divorce action, but rather did so while on a six-month stay during the winter months to improve her health, neither did she go there for the purpose of establishing a bona fide permanent residence, as was evident from her return to the United States shortly after the decree had been obtained. In Ruderman v *819 Ruderman (193 Misc 85 [Sup Ct, NY County 1948], affd 275 App Div 834 [1st Dept 1949]), the spouses, both natives of New York City, had married in Mexico, where the husband had a student visa which was renewable yearly and the wife, who remained a schoolteacher in New York, lived with him there for a couple of summer vacations during his four-year stay. The court found that the husband had not acquired a domicile in Mexico, having inferred from the timing of his presence there that he was avoiding conscription for the Armed Forces of this country during the years of the Second World War, at the conclusion of which he promptly returned.
Had respondent, Dosie Mae Brown, brought a declaratory judgment action soon after having learned of the Korean divorce decree and of the decedent’s purported remarriage to the petitioner, it is possible, consonant with the last two cases mentioned, that she would have prevailed on her claim to recognition by this State as his true wife. However, she took no such action.
The holdings in later cases and divorce reform in this State began to militate against her prospects of success.
In Rosenstiel v Rosenstiel (16 NY2d 64 [1965], cert denied 384 US 971 [1966]) the Court of Appeals, after conceding that a considerable emphasis had been placed by the United States Supreme Court upon domicile as a prerequisite to compulsory recognition of sister State decrees under the full faith and credit clause, nevertheless proceeded to state that domicile is not intrinsically an indispensable prerequisite to jurisdiction. Ratifying a host of decisions below, it held that it was not part of the public policy of the State of New York to refuse recognition to bilateral (quickie) Mexican divorces of New York domiciliaries, though they be granted on grounds unacceptable here. The personal appearance of plaintiffs before Mexican courts in such cases were usually fleeting and purely formalistic, and the whole process could be accomplished within an hour, but the plaintiff’s physical presence was adjudged to carry with it legal incidents of the marriage itself, a concept termed needful in a highly mobile society. The voluntary appearance of the defendant by attorney, said the court, tended to give "further support” to an acquired jurisdiction there over the marriage as a legal entity.
Soon after Rosenstiel (supra), comprehensive divorce reform was enacted and several new, liberal grounds for divorce were added to the long-standing ground of adultery, including, *820 among others, cruel and inhuman treatment and a no-fault ground consisting of separation for a period of two years pursuant to a written separation agreement (see, Domestic Relations Law § 170, added by L 1966, ch 254, § 2 [eff Sept. 1, 1967]). With this development, it would seem that correspondingly less reason existed to assert public policy grounds for withholding recognition to decrees of other jurisdictions on behalf of New York domiciliaries. (A statute enacted simultaneously [Domestic Relations Law former § 250] which nevertheless created a prima facie presumption that a person obtaining a divorce elsewhere was domiciled in New York if he was so domiciled within 12 months prior to its commencement, and presumed resident here within 18 months after departure, was repealed in 1980 [L 1980, ch 281, § 18].)
In Lacks v Lacks (41 NY2d 71 [1976], rearg denied 41 NY2d 862 [1977]), it was authoritatively held that this State’s own durational residency requirements to maintain an action for divorce are not, as had previously been thought, jurisdictional, but rather merely substantive elements of a cause of action for relief. The residency rules were deemed to have been designed for the purpose of preventing this State from becoming a haven for migratory divorce, not to subtract from the inherent competence of its courts to entertain matrimonial actions. Thus, a defendant who had appeared in a New York divorce action could not, after final judgment, collaterally attack the subject matter jurisdiction of the court to make the decree as void in New York or elsewhere on the basis that the plaintiff’s New York residence had subsisted less than the one-year or two-year period called for by the statute (depending on the particular ground) so long as the plaintiff had the minimal contacts with New York said to make the decree enforceable under the full faith and credit clause.
In a closely related development, the Domestic Relations Law was amended in 1976 to provide that if a married person "dwells” in New York at the time that he or she commences a matrimonial action, he or she is deemed to be a New York "resident” (Domestic Relations Law § 231, as amended by L 1976, ch 62, § 4). Although there are decisions continuing to adhere to the long-held view that "residence” as used in the statutes prescribing jurisdiction of matrimonial cases must be construed to require domicile (Geiser v Geiser, 102 Misc 2d 862 [Sup Ct, NY County 1980]; Werner v Werner, 101 Misc 2d 414 [Sup Ct, NY County 1979]), as is true in most other States of the Union (see, Juenger, op. cit., at 15, n 68), the better view, *821 and one which accords with the Law Revision Commission’s purpose in drafting the bill (Law Rev Commn memorandum, McKinney’s 1976 Session Laws of NY, at 2168), is that proof of domicile is no longer to be required. Some cases have so held. (See, Small v Small, 96 Misc 2d 469 [Sup Ct, Schenectady County 1978]; Langlais v Langlais, 90 Misc 2d 29 [Sup Ct, Dutchess County 1977].)
It was determined in Greschler v Greschler (51 NY2d 368 [1980]) that New York would not withhold effect to a divorce decree of the Dominican Republic which incorporated a separation agreement in which the wife waived her right to support from her husband which, at the time of such waiver, was prohibited under General Obligations Law § 5-311. The only germane public policy, said the court, was the present public policy of this State. Since the General Obligations Law had since been amended to provide that either spouse may waive the right to support from the other unless doing so is likely to make one a public charge (General Obligations Law § 5-311, as added by L 1980, ch 281, § 19), the Dominican decree was entitled to comity. The applicable principles were set forth in some detail: "While it is generally the rule in this State that where the basic public policy of the forum would be offended a court can refuse to recognize the validity of a foreign judgment (cf. Ehrlich-Bober & Co. v University of Houston, 49 NY2d 574; Mertz v Mertz, 271 NY 466, supra), the public policy exception to the doctrine of comity is usually invoked only in the rare instance 'where the original claim is repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.’ (Restatement, Conflict of Laws 2d, § 117, Comment c; Zeevi & Sons v Grindlays Bank [Uganda], 37 NY2d 220, 227-228; see, also, Leflar, American Conflicts Law, § 48, pp 90-92.) Thus, for this court to refuse full recognition to a lawful foreign judgment, it must be demonstrated that the decree violates 'some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal.’ (Loucks v Standard Oil Co., 224 NY 99, 111.) Public policy should not be 'determinable by mere reference to the laws of the forum alone’ or 'in the decisions of our courts in the Victorian era’. (Intercontinental Hotels Corp. [Puerto Rico] v Golden, 15 NY2d 9, 14.) Rather, public policy should be predicated upon 'the prevailing attitudes of the community’. (Ehrlich-Bober & Co. v University of Houston, 49 NY2d 574, 580, supra.) It follows that foreign judgments generally should be upheld unless *822 enforcement would result in the recognition of a 'transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense.’ (Intercontinental Hotels Corp. [Puerto Rico] v Golden, 15 NY2d 9, 13, supra [emphasis supplied].)” (51 NY2d, at p 377.)
That reasoning is applicable here. In view of New York’s present assertion of its own prerogative to terminate marital status based upon a plaintiffs residence within this State for a minimum period of time and irrespective of the domicile of either party, it would be nonsensical to deny effect to the Korean decree on the basis that the decedent may not have been a domiciliary when it was granted, though he was unquestionably a bona fide resident of that nation and, what is more, living there for a purpose unrelated to institution of a divorce action. Neither can it be said that the grounds on which the foreign decree was granted provide measurably less protection to the preservation of the marital bond than those which have been available in New York for nearly two decades now.
Respondent’s remaining contentions are easily disposed of. The failure of the Korean tribunal or of the plaintiff therein to supply her with English translations of papers served upon her does not offend procedural due process. She was entitled to notice of the proceeding commenced in the Korean court and an opportunity to be heard. These requirements were fulfilled by service upon her of the papers in the matrimonial action. While the papers were in the Korean language and no translations into English were provided, our own law makes no provision of that kind and, in any event, she has little reason to complain as she admits that she deduced the general object of the service. As for the Korean court’s conceded want of personal jurisdiction over her, the lack of such jurisdiction was not relevant in determining the ability of the Korean court to render a judgment affecting the marital status. As stated, as long as decedent had a reasonable relationship to Korea when his action was commenced, that was sufficient for the Korean court to validly affect the marital status. Undoubtedly, by reason of the lack of personal jurisdiction over her, she retained certain personal rights stemming from the marriage relation, including the right to seek alimony and support and custody of minor children, if any, in this State, had she cared to avail herself of them. (See, e.g., Vanderbilt v Vanderbilt, 354 US 416 [1957]; May v Anderson, 345 US 528 [1953]; Estin v Estin, 334 US 541 [1948].) Such rights do not include *823 the right to elect against the will in this State, for that right falls, by statute, with the marital status irrespective of the ex parte character of the divorce. (EPTL 5-1.2; Rosenstiel v Rosenstiel, 368 F Supp 51 [US Dist Ct, SDNY 1973], affd 503 F2d 1397 [2d Cir 1974]; cf. Rice v Rice, 336 US 674, supra.)
Accordingly, the purported right of election filed against the will by Dosie Mae Brown is determined to be without force or effect.