623 So.2d 1005 (1993)
AETNA CASUALTY AND SURETY COMPANY
v.
Hal Otis WILLIAMS, Sr., Individually, Hal Otis Williams, Sr., as Administrator of the Estate of Hal Otis Williams, Jr., Mechell Williams and Nedra Williams, Minors, By and Through Hal Otis Williams, Sr., as Natural Father and Next Friend.
89-CA-0790.
Supreme Court of Mississippi.
September 2, 1993.
David A. Barfield, Kirkland Barfield & Moore, Jackson, Steven C. Panter, Marietta, GA, for appellant.
James Ed Brown, Starkville, for appellees.
Jonathan B. Fairbank, John Jones Law Office, Jackson, amicus curiae.
En Banc.[1]

*1006 ON PETITION FOR REHEARING
McRAE, Justice, for the Court:
Aetna Casualty and Surety Company appeals a judgment from the Chancery Court of Oktibbeha County awarding the estate of Hal Otis Williams, Jr., $20,000 under the uninsured motorist provisions of an automobile policy held by Hal Otis Williams, Sr. The threshold issue on appeal is whether an unemancipated minor of divorced parents is a resident of the household of both parents for purposes of the Uninsured Motorist Act.[2] We affirm the chancellor's finding that the minor decedent was a resident of both parents' households, thereby entitling his estate to uninsured motorist benefits under the Aetna policy.

FACTS
Hal Otis (Junior) Williams, Jr., a nineteen-year-old student at Mississippi State University, was killed in a two-car accident on May 30, 1987. Neither the car in which he was riding as a passenger nor the other vehicle involved were covered by liability insurance. The present suit arose from Junior's father's attempt to recover against Aetna Insurance Company under his uninsured motorist policy.
Junior's parents, Hal Otis Williams, Sr. (Williams), and Mary Frances Williams (Mary Williams) were divorced on February 11, 1982. Mary Williams was awarded permanent custody of the couple's three minor children, subject only to reasonable visitation rights with Williams.
The record indicates that Junior had his own bedroom at each parent's home. He also kept some of his personal items at a friend's dormitory room on the Mississippi State campus, where he often stayed on weekends and during football season.
At the time of his death, Junior's mailing address on his school records and driver's license was listed as 59 Bennett Drive, Starkville, Mississippi, his mother's home. Williams stated that this address was used in order to facilitate Junior's school loans.
Williams purchased a used car for Junior, and paid for its maintenance and frequent repairs. He carried Junior on his health insurance policy and, until changes were made in the tax laws in 1987, listed Junior and his two sisters on his tax returns as dependents.
At the time of Junior's death, Williams had an automobile liability insurance policy with Aetna Casualty & Surety Company (Aetna) with $20,000 uninsured motorist coverage on the two automobiles he owned. Paragraph II(a) of the policy states:
II. PERSONS INSURED
Each of the following is an insured under this insurance to the extent set forth below:
(a) the named insured and, while residents of the same household, the spouse and relatives of either. (Emphasis added).
This policy language follows exactly the definition of "insured" provided by Miss. Code Ann. § 83-11-103(b) (Supp. 1986).
Junior died intestate, and Williams was appointed administrator of Junior's estate. Junior's heirs were Williams, Mary Williams, and his sisters, Mechell and Nedra.
On July 8, 1987, Williams' attorney, James E. Brown, wrote to Aetna demanding payment of $20,000 in uninsured motorist benefits to Junior's estate. Aetna requested signed affidavits stating that neither vehicle involved in the accident was covered by liability insurance as well as proof that Junior was "regularly residing in the household of Hal Otis Williams, Sr., our named insured." In response, Williams sent Aetna the requisite affidavits regarding the accident as well as two additional affidavits as proof that "for some time prior to the death of HAL OTIS WILLIAMS, JR., that he was a resident at 105 Churchill Circle, Starkville, Mississippi, which is the residence of the decedent's father Hal Otis Williams, Sr." One was signed *1007 by Williams, the other, by Junior's sister, Nedra.
After receiving these affidavits, Aetna sent a check to James E. Brown for $20,000 payable to Williams, Mary Williams, Nedra Williams, Mechell Williams and James E. Brown, along with a release. Williams signed the release at Brown's office. He then took it home and, without their permission or knowledge, signed the names of Mary Williams, Nedra and Mechell on the release as well as on the check. Two checks were later written from Brown's trust account, where the original check had been deposited, one payable to Williams for $9,000 and one payable to Williams and Nedra for $4,334. The remainder of the $20,000 ($6,666) was retained by Brown as attorneys' fees.
On November 27, 1987, Mary Williams filed suit in federal court against her automobile insurance carrier, Maryland Casualty Company, seeking to recover uninsured motorist benefits as a result of Junior's death. She claimed that Junior was a resident of her household at the time of his death, and therefore that she was entitled to recover uninsured motorist benefits. Approximately one month after it paid Williams' claim, Aetna learned of Mary Williams' suit against Maryland Casualty. On June 30, 1989, Aetna filed a complaint against Williams, his daughters and his attorney in the Oktibbeha County Chancery Court for return of the funds, alleging fraud in securing payment under the policy.
At the February 20, 1988, hearing in chancery court, Mary and Nedra Williams, as well as several of Junior's friends, testified that Junior spent most of his time at his mother's house. Williams and his wife offered testimony about the time Junior spent with them, particularly in the last few weeks before his death, after Junior and his mother had an argument about a six-pack of beer.
Following the hearing, the chancellor rendered a bench opinion finding that while Williams had forged the names of Mary Williams, Nedra Williams and Mechell Williams on the release as well as on the endorsement of the check from Aetna, the affidavits were not forged, and thus there had been no fraud in obtaining payment of the claim.
The chancellor further found that although Junior was principally a member of his mother's household, he was also a resident of his father's household. The chancellor held:
Just because this mother and father are uncooperative is not sufficient of itself for this Court to determine and so adjudicate that children of divorced parents do not remain residents of both households. The divorce decree in no wise terminates parental rights, duties and obligations. If the insurance carriers are desirous of precluding children similarly situated, they may do so by expressed contractual provision.
In the final judgment, the chancellor noted that:
The Court finds factually that the decedent was a resident of both households at the time of his death, and that under the facts presented to this Court, children of divorced parents may establish two residencies, one with each parent, and thereby become an insured of either or both parents, under the terms and conditions of the insurance contract relating to uninsured motorist coverage.
The chancellor accordingly dismissed Aetna's claim, but removed Williams as administrator of the estate because of his handling of the claim proceeds.
Aetna appeals from an adverse ruling, asserting primarily that the minor decedent was a resident of his mother's household, but not of the household of his father.

LAW
In this case, we are called upon to determine whether a minor child of divorced parents may be considered a "resident of the same household" of both parents pursuant to the language of the Uninsured Motorist Act, Miss. Code Ann. § 83-11-103(b) (Supp. 1986). The uninsured motorist policy Aetna issued to Hal Williams, Sr. expressly followed the statutory definition of the term "insured," providing coverage for Williams and all relatives who reside in his household. That Junior was his father's relative is beyond question. *1008 However, Aetna asserts that at the time of his death, Junior was not a resident of his father's household, notwithstanding that Junior maintained a room at his father's house in which he kept clothes and other personal belongings; that Williams helped provide for his son's material needs, including buying him a car and giving him money; that Junior was named on Williams' hospitalization policy and that Williams claimed Junior as a dependent on his tax returns until the 1986 Tax Reform Act prevented a non-custodial parent from claiming the minor child as a dependent regardless of the amount of support paid over and above the parent that had paramount custody.[3] According to Aetna's rationale, it does not matter that Junior, despite being in the legal custody of his mother, was still his father's minor son and thus also an integral part of his father's family. However, because two parents can no longer live together, their responsibilities to their children do not change and the children remain a part of each parent's family.
The chancellor expressly found as follows:
[B]oth the father and mother of the decedent, who were divorced, maintained separate households and residency in Starkville, Oktibbeha County, Mississippi, and that the decedent under the proven facts was a resident of the mother's household and also of the father's household, and that as envisioned by the contract of insurance before the Court, the decedent was a resident of his father's household and was an insured under the terms and conditions of the insurance contract... . The Court finds that just because parents are divorced and uncooperative this does not constitute sufficient facts to say that children of divorced parents do not remain residents of both households where the facts show to the contrary... . The Court finds factually that the decedent was a resident of both households at the time of his death, and that under the facts presented to this Court, children of divorced parents may establish two residencies, one with each parent, and thereby become an insured of either or both parents, under the terms and conditions of the insurance contract relating to uninsured motorist coverage.
The record undeniably contains substantial evidence supporting the chancellor's finding that Junior resided in both his mother's and his father's households. Further, the chancellor's decision reflects the familiar public policy that courts must interpret the terms of an insurance policy (and the statutes from which they derive) liberally in favor of providing coverage for the insured. The holding of the lower court is thus well-grounded in both law and reason.
The policy provision at issue reads:
II. PERSONS INSURED
Each of the following is an insured under this insurance to the extent set forth below:
(a) the named insured and, while residents of the same household, the spouse and relatives of either.
This language reflects the wording of Mississippi's uninsured motorist statute, Miss. Code Ann. § 83-11-103 (Supp. 1986), which provides:
As used in this article:
.....
(b) The term "insured" shall mean the named insured and, while resident of the same household, the spouse of any such named insured and relatives of either.
We consistently have held that the language of the Mississippi Uninsured Motorist Coverage Act "must be construed liberally to provide coverage and strictly to avoid or preclude exceptions or exemptions from coverage." Harris v. Magee, 573 So.2d 646 (Miss. 1990); accord Cossitt v. Federated Guaranty Mutual. Ins. Co., 541 So.2d 436, 440 (Miss. 1989); Washington v. Georgia American Ins. Co., 540 So.2d 22, 24 (Miss. 1989); Wickline v. United States Fidelity & Guaranty Co., 530 So.2d 708, 711 (Miss. 1988); Mississippi Farm Bureau Mutual Insurance Co. v. Garrett, 487 So.2d 1320, *1009 1323 (Miss. 1986); Matthews v. State Farm Mutual Automobile Insurance Co., 471 So.2d 1223, 1225 (Miss. 1985); State Farm Mutual Automobile Insurance Co. v. Nester, 459 So.2d 787, 790 (Miss. 1984); Stevens v. United States Fidelity & Guaranty Co., 345 So.2d 1041 (Miss. 1977); Parker v. Cottonbelt Insurance Co., Inc., 314 So.2d 342 (Miss. 1975). Our law thus embodies a mandate that the term "resident" be construed broadly to include Williams' son as an insured under the father's uninsured motorist coverage. The term "resident" appears in both the policy and the statute by which it is governed, and we must read both provisions broadly as a matter of public policy.
The chancellor's decision also harmonizes with the legislative intent and purpose which gave rise to the Uninsured Motorist Act. The legislature, in setting mandatory parameters of who constitutes an "insured" under an uninsured motorist policy, chose the word "residence" instead of the more restrictive term "domicile." Given the profusion of divorces and broken homes in today's society, it is clear why the legislature selected the more generous term. Quite often, a non-custodial parent provides insurance for his or her children even though the children spend more time with the other parent. It is easy to imagine a situation where a custodial parent purchases an uninsured motorist policy with only the basic $10,000-$20,000 coverage, and the non-custodial parent wishes to purchase a policy which provides the child with greater coverage. Were we to accept Aetna's reasoning, the non-custodial parent could provide his or her child with no uninsured motorist coverage whatsoever. The parent would then shoulder the burden of the exorbitant costs of any injuries suffered by the child which were caused by an uninsured motorist and be held accountable for failing to see that his child was reasonably protected from such losses. The chancellor was thus correct in holding, as a matter of policy, that a minor child qualifies as a "resident" in both households of divorced parents.
To construe the term "resident" otherwise would also conflict with Miss. Code Ann. § 93-13-1 (1972) which provides in part: "The father and mother are the joint natural guardians of their minor children and are equally charged with their care, nurture, welfare and education, and the care and management of their estates." Parental rights and responsibilities continue despite divorce. Providing insurance is surely part of the proper "care" and "welfare" that parents should provide for their children, as evidenced by the number of child support decrees requiring the non-custodial parent to pay for a minor child's insurance coverage. See Miss. Code Ann. § 93-5-23 (Supp. 1992). A stricter interpretation could dissuade non-custodial parents from fulfilling the mandate to provide fully for the maintenance and support of their minor children.
Generally, a person may reside in more than one household. We do not require a child to relinquish residence with one parent in order to establish residence with the other nor have we ever before defined the terms "resident" or "residence" so restrictively.
Apparently, Aetna desires that we equate the term "residence" with the term "domicile." The law is clear that a person can have but one domicile. In re Estate of Burshiem, 483 N.W.2d 175 (N.D. 1992); In re Marriage of Tucker, 277 Cal. Rptr. 403, 226 Cal. App.3d 1249 (Cal.Ct.App. 1991); Laufer v. Hauge, 528 N.Y.S.2d 878, 140 A.D.2d 671 (N.Y. App. Div. 1988); Mutual Service Casualty Insurance Co. v. Olson, 402 N.W.2d 621 (Minn.App. 1987); Davis ex rel. Davis v. Maryland Casualty Co., 76 N.C. App. 102, 331 S.E.2d 744 (N.C. Ct. App. 1985); Gowins v. Gowins, 466 So.2d 32 (La. 1985). Once established, a person's domicile remains stationary absent a clear indication of intent to abandon the existing domicile and to establish another. However, one may still have other residences. See Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (person can reside at one place but be domiciled at another).
Residence is an entirely different and more flexible concept. The limitations applicable to one's domicile do not apply to one's residence. For instance, a person may have multiple residences simultaneously. In re Estate of Burshiem, 483 N.W.2d 175 (N.D. 1992); In re Marriage of Tucker, 226 Cal. *1010 App.3d 1249, 277 Cal. Rptr. 403 (Cal. App.Ct. 1991); Laufer v. Hauge, 140 A.D.2d 671, 528 N.Y.S.2d 878 (N.Y. App. Div. 1988); Mutual Service Casualty Insurance Co. v. Olson, 402 N.W.2d 621 (Minn. Ct. App. 1987); Davis ex rel Davis v. Maryland Casualty Co., 76 N.C. App. 102, 331 S.E.2d 744 (N.C. Ct. App. 1985); Gowins v. Gowins, 466 So.2d 32 (La. 1985). Further, a dwelling place need not be fixed and permanent in order to qualify as a residence. Even a temporary and transient habitation can qualify. See Huffman v. Huffman, 232 Neb. 742, 441 N.W.2d 899 (1989); In re Brown, 132 Misc.2d 811, 505 N.Y.S.2d 334 (N.Y.Sur. 1986); see also Black's Law Dictionary, "Domicile" at 572 (4th ed. 1951) ("`Domicile' and `residence' ... are frequently distinguished, in that domicile is the home, the fixed place of habitation; while residence is a transient place of dwelling."). To merge these two concepts would constitute an abrupt departure from prior caselaw in most jurisdictions, including ours. See Jones v. State, 207 Miss. 208, 42 So.2d 123 (1949) ("Ordinarily, `domicile' and `residence' are not synonymous or controvertible terms."); accord, Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989); McMahon v. Louisiana Insurance Guaranty Ass'n, 596 So.2d 1384 (La. Ct. App. 1992); Greenwood v. Hildebrand, 357 Pa.Super. 253, 515 A.2d 963 (Pa.Super. 1986).
A more narrow construction of "residence" would bear no resemblance to the term's commonly accepted meaning. Former President of the United States, George Bush, for instance, was a resident of Texas and Maine, in addition to being a resident of Washington, D.C. His "official residence" was a hotel suite in Houston, Texas, although he stayed there on a relatively infrequent and transient basis. Likewise, college students are still residents of their parents' home even if they rarely return there during the school year.
It has been held that "the term `residence' imports merely having abode at a particular place which may be one of any number of such places at which one is, at least from time to time, physically present." In re Brown, 505 N.Y.S.2d 334, 132 Misc.2d 811 (N.Y.Sur. 1986). Whether a person "resides" at a particular location is a practical question which turns on the degree of one's attachment to a particular place of abode. In the instant case, Junior's attachment to his father's household was considerable. He had a room. He had clothing and personal possessions there. He stayed there at least occasionally. He depended, in part, on his father to provide transportation and money. His father carried him on a hospitalization insurance policy. Moreover, he was still his father's son and a part of his father's family. The trial court found each of these facts to be true and concluded in a very thoughtful and astute opinion that Junior was sufficiently connected to his father's household to be considered a resident thereof. The trial court's findings are fully supported by the record and are not manifestly erroneous.
Other jurisdictions are split as to whether a child of divorced or separated parents continues to be a "resident" of both parents' households within the meaning of an uninsured motorist provision in a parent's insurance policy. See David B. Harrison, Annotation, Who Is "Member" or "Resident" of Same "Family" or "Household," Within No-Fault or Uninsured Motorist Provisions of Motor Vehicle Insurance Policy, 96 A.L.R.3d 804 (1979); Couch on Insurance 2d § 45:637 (1981). Numerous courts have found that a minor child may be considered a member or resident of a non-custodial parent's household for purposes of uninsured motorist coverage. Snedegar v. Midwestern Indemnity Co., 44 Ohio App.3d 64, 541 N.E.2d 90 (1988); Grange Mutual Casualty Co. v. Brinkley, 182 Ga. App. 273, 355 S.E.2d 767 (1987); Alava v. Allstate Insurance Co., 497 So.2d 1286 (Fla.App. 3 Dist. 1986); Ferrel v. Allstate Insurance Co., 106 Idaho 696, 682 P.2d 649 (App. 1984); Bond v. Commercial Union Assurance Co., 407 So.2d 401 (La. 1981). Other courts, however, have rejected the extension of coverage. Davis v. Hartford Insurance Co., 456 So.2d 302 (Ala. 1984); Pierce v. Aetna Casualty & Surety Co., 29 Wash. App. 32, 627 P.2d 152 (1981). We believe the former is the better approach.
A minor is legally unable to establish a residence separate and apart from his or her parents. Because a child's parents *1011 are unable to live together or because custody is granted to one parent, the other party's parental rights are not extinguished. An award of physical custody is never etched in stone. It may be changed or modified as material changes in circumstances dictate. When a child reaches the age of fourteen, he may even choose the parent with whom he prefers to stay. In some cases, joint physical custody may be arranged.
Our laws require that where the evidence shows that both parents have separate incomes or estates, each shall contribute to the support and maintenance of the children of the marriage to the extent of his or her financial ability. Miss. Code Ann. § 93-5-23 (1972). Moreover, legally responsible parents may be required by the court to provide health insurance for their children. Miss. Code Ann. § 93-5-23 (Supp. 1992). Just as a child remains a member of both households when his parents divorce, so each parent remains a parent to that child.[4] Parental responsibilities are not predicated upon love or affection for the child or the frequency of their visits. Neither are they based upon the parents' decision to live together or apart or even marital status. Miss. Code Ann. § 93-13-1 (Supp. 1992).
Where one parent is precluded from recovering under an insurance policy covering the minor child, a disproportionate burden of the loss may fall on the other parent. Further, it is often the non-custodial parent who is in a better financial position to maintain insurance policies on the minor children. Thus, to thwart the non-custodial parent's ability to provide uninsured motorist coverage for his children and recover under any policies he holds could serve not only to limit the protection available to the child, but also adversely impact the custodial parent.
A non-custodial parent is just as much a "parent" as a custodial parent and the child is still a member of the non-custodial parent's family. Consequently, the child is still a "resident" in the household of the non-custodial parent. We hold, therefore, that a child is a resident of both parents' households until he or she reaches the age of majority or becomes fully emancipated.
The chancellor found that Junior was a resident of his father's household, and thus qualified as an insured under Williams' uninsured motorist policy with Aetna. Accordingly, we affirm the judgment of the chancery court dismissing Aetna's claim.
AFFIRMED.
DAN M. LEE, P.J., and SULLIVAN, BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
HAWKINS, C.J., dissents with separate written opinion joined by PRATHER, P.J., and PITTMAN, J.
HAWKINS, Chief Justice, dissenting:
In deference to my colleagues, I must respectfully dissent.
This is not a case of Hal Otis Williams, Jr.'s estate being denied any uninsured motorist benefits; clearly it is entitled to such coverage under the policy of his mother, in whose household he resided when killed. Instead, it is an attempt by his father to secure additional uninsured motorist benefits under his policy through a spurious claim, which, thanks to the majority, is successful.
The majority's opinion is ambiguous. First, by glossing the facts, it tells us that Junior on May 30, 1987, indeed was a "resident of the same household" of his father, as well as of his mother. If Junior were in fact a "resident of the same household" as his father, the remainder of the opinion is dicta. Recognizing this, the majority proceeds to pronounce as a principle of law that, regardless of the facts, wherever a child of divorced parents lives, he will for uninsured motorist coverage purposes as a matter of law be deemed a resident of both parents' households. Clearly Miss. Code Ann. § 83-11-103 (1972) says no such thing.[1]
*1012 The majority is wrong; all I ask is the patience to hear me out.
First, the facts.

FACTS
Hal Otis Williams, Sr. (Williams), and Mary Frances Williams (Mary Williams) were married April 17, 1967. Three children were born of their marriage, namely: Hal Otis Williams, Jr. (Junior), born August 31, 1967; Nedra D. Williams, born July 25, 1969; and Mechell D. Williams, born August 25, 1975. Mary Williams was granted a divorce from Williams on February 11, 1982, and was awarded permanent custody of their children, subject only to a reasonable right of visitation in him. Thereafter she retained their lawful custody.
Williams and Julia Ann Tucker had a daughter, Latrasa, and married in 1986. Beginning in 1985, Williams and his family lived at 105 Churchill Circle in Starkville, in a three-bedroom house. Williams was 42.
Mrs. Mary Williams was employed as a maid. In 1985, she purchased a four-bedroom house at 59 Bennett Drive in Starkville. One of the bedrooms, which had a closet, dresser and chest of drawers, was Junior's, where he kept his clothes, his stereo and television, football helmets, weights, pictures, trophies and other personal belongings. His closet was "full of clothes." (R.III, 65) Junior's Mississippi State University records and his driver's license showed his address at 59 Bennett Drive.
Upon graduation from high school, Junior spent a year in junior college in Scooba to improve his academic standing; and he then returned to Starkville in 1986, where he enrolled at State and played football. He was never assigned a room at any university dormitory, however, but, instead, continued living at home with his mother at 59 Bennett Drive. He frequently spent the night with one of his many friends in McArthur Hall; and, especially during football season, many weekends were spent away from home, when he would sleep in a friend's dormitory room. He had some of his clothes in a friend's room.
Among Junior's friends in Starkville and attending the University were Willie Monroe, Derwood Minor, Jessie Anderson, Ted Hubbard, Michael Taylor and Jerry Myers. Beginning in 1986, following his return to his mother's home, he would several times each week have some of these friends visiting him at his home at 59 Bennett Drive, where they would eat, talk, watch television, and at times drink beer. His sister, Nedra, stayed at the home of her paternal grandmother, but was in and out of her mother's house several times a week. She would see Junior there during the week and on weekends, often with several of these friends.
Williams purchased a used car from Mrs. Mary Williams that she was going to trade in, and gave it to Junior. Junior needed money from Williams from time to time to pay for repairs. No liability insurance was carried on this car.
Williams quit claiming Junior as a dependent on his tax return after 1985 because, according to him, "his mother was claiming" and "so I left the claim alone. I don't carry nobody but the daughters with me." (R.I, 45-6; III, 148)[2]
On Saturday, May 30, 1987, Junior was riding as a passenger in a car being driven by his friend, Willie Monroe, on Highway 45 in Lowndes County, when there was a two-car accident in which Junior, 19 years of age, was killed. Neither vehicle carried liability insurance.
Williams furnished the information at the hospital for his son's death certificate, and gave "59 Bennett Street" as Junior's residence.
Williams had a policy with Aetna Casualty & Surety Company (Aetna), with $20,000 uninsured motorist coverage on a Chrysler *1013 and an Oldsmobile automobile belonging to him. Paragraph II(a) of that policy states:
II. PERSONS INSURED
Each of the following is an insured under this insurance to the extent set forth below:
(a) the named insured and, while residents of the same household, the spouse and relatives of either. (Emphasis added)
Junior's heirs were Williams, Mary Williams, and his sisters Mechell and Nedra.
On July 8, 1987, Williams' attorney, James E. Brown, wrote Aetna demanding payment of $20,000 to Junior's estate. In response, Aetna requested signed affidavits stating that neither vehicle involved in the accident was covered by liability insurance, and proof that Junior was "regularly residing in the household of Hal Otis Williams, Sr., our named insured." Williams sent Aetna three affidavits stating that the vehicles involved in the accident were not covered by liability insurance. He also sent one affidavit signed by himself and another signed by Nedra which stated that "for some time prior to the death of HAL OTIS WILLIAMS, JR., that he was a resident at 105 Churchill Circle, Starkville, Mississippi, which is the residence of the decedent's father, Hal Otis Williams, Sr." Mrs. Mary Williams refused Williams' request to sign an affidavit stating that Junior resided with him. After receiving these affidavits, Aetna sent a check to Brown for $20,000, payable to Williams, Mary Williams, Nedra Williams, Mechell Williams and Brown, along with a release.
Williams signed his name to the release and on the check. The names of Mary, Nedra and Mechell on the release, and endorsed the back of the check were all forged. Williams took the check back to Brown for deposit in Brown's trust account. Two checks were written from the account, one payable to Williams for $9,000 and one payable to Williams and Nedra for $4,334. Williams kept all the money from both checks. To cash the check to himself and Nedra, he either had to endorse Nedra's name, himself, or have someone else do so. The remainder of the $20,000 ($6,666) was retained by Brown as attorneys' fees.
On November 27, 1987, Mary Williams filed suit in federal court against her automobile insurance carrier, Maryland Casualty Company (Maryland), seeking to recover uninsured motorist benefits as a result of Junior's death.[3] Maryland gave Aetna copies of depositions taken in the Mary Williams suit. Nedra in her deposition said that she did not read the affidavit which stated that Junior was a resident of Williams' before she signed it and that the statements contained in it were false.
On June 30, 1989, Aetna filed a complaint in the chancery court for return of the funds, alleging fraud in securing payment under the policy. The named defendants were: Hal Otis Williams, Sr., individually and as administrator of the estate of Hal, Jr.; Mechell Williams and Nedra Williams, Minors, By and Through Hal Otis Williams, Sr., as Natural Father and Next Friend; and Brown.
At the hearing before the chancellor, there was no dispute as to the facts above set forth. Mrs. Mary Williams testified that on the Wednesday, May 27, before her son's death on Saturday, May 30, Junior and his friend, Willie Monroe, were at her home when she left to go to the hospital. She called her home on Thursday and Friday following and talked to her son.
On that Saturday morning Junior telephoned his mother at the hospital, told her he and Willie Monroe were at home cooking breakfast, and that his baby sister had called from Indiana wanting to come home. (R.III, 76) On that Saturday night before he was killed, Junior, accompanied by Willie Monroe, visited Mrs. Williams in the Clay County Hospital. As they were leaving Junior told his mother that they were going home to wash their clothes because they were going to a concert. (R.III, 58-9)
She also testified that, at the time of his death, Junior and his father were not on *1014 good terms because Williams would not pay the entire bill to get Junior's car out of a shop, but told him his mother would have to pay the rest. (R.III, 78-9)
She testified that, other than a weekend two weeks before his death when Junior went to Atlanta with a football friend to see about a summer job, he had spent the night at her home every night for the past several months. She testified that during football season Junior would quite often stay in Willie Monroe's or Derwood Minor's dormitory room, but other than football season, it was, "Now and then. Not very often." She said her son always let her know where he was, and, "Even when he'd go out of town, he would always call every morning before I'd go to work; or, wherever he was, he always called."
She testified that Junior was always bringing his friends to their home, saying "They were just like one of my children." They would eat and on Saturdays would rent movies and watch videos. On weekends, frequently, some would spend the night at their house. When asked who these friends were, she stated, "Derwood Minor, Marcus Bush, Sangster, Michael Taylor, Jerry Myers, Judis Dancer, Chuck." (R. 64) She testified that Junior had some dressy clothes at one of his friend's dormitory room to wear after games, and an overnight bag and toothbrush.
Mrs. Williams testified that when she returned home one Saturday afternoon in February, 1987, all of the beer in the refrigerator was gone. She asked Junior about it, and he told her that he and his friends had drunk it. According to her, "I told him when he got to the place where he drank beer, then he has to have a job and he would have to be not in my house, and that's what we had the argument about. He told his father about it." Also, according to her, Williams came over the next day and reprimanded her for scolding Junior, telling her that he was old enough to drink beer.
She said that Junior never moved out of the house because of this incident, or for any other reason. Throughout the next months until his death, except for occasionally being with a friend on the weekend, he spent every night at her home.
Mrs. Williams testified Junior "never took residence with his father." During his lifetime she had "known him to spend the night from time to time," but "not very often," (R.III, 61) and she was certain he never spent two nights in succession at his father's. (R.III, 78)
Mrs. Williams testified that she was giving her testimony with the knowledge that she stood to lose her interest in the Aetna insurance proceeds if Williams did not prevail in this case.
Jessie Anderson, Ted Hubbard, Michael Taylor and Jerry Myers, all college friends of Junior's, testified to many visits to his home address for over a year before he died. They went to his home several times a week, ate meals there, and watched television. They talked to him on the phone there. Often they would be in a group at his home. They were familiar with his room. None of these friends ever knew of any time when Junior spent the night with his father. They had, upon occasion, gone with him when he went to his father for money or help on his car, and would stay for about twenty minutes. They never heard him say anything about staying any nights with his father.
As above set forth, Nedra Williams testified that while she did not live at her mother's home, she was there three or four times a week, and that this was Junior's home. She said that he spent a lot of time in the dormitory with a buddy. She never heard anything from Junior about staying with his father. Junior entertained friends many times at their mother's home. She went to their father's two or three times a month in the months before Junior's death, and never saw her brother there. She had only heard that he had occasionally spent the night at their father's.
Nedra testified that she signed the October 9, 1987, affidavit to Aetna at her father's request and did not read it.
The only witnesses testifying for Williams were himself and his wife, Julia. Williams did not contradict any of the testimony of Mrs. Williams as to Junior's residence, except for a period of two or three weeks in *1015 February or March, 1987, when he said Junior moved in with him at 105 Churchill Circle because he and his mother had a falling out about some beer. During this period, when he said Junior was staying with him, he did not know how often his son actually spent the night with him because he would come in late at nights, sometimes as late as 3:00 a.m. Asked how long Junior stayed there in his home, Williams replied, "I guess about two or three weeks." (R.III, 137, 149) Then Junior removed himself and his clothes from Williams' house. (R.III, 149) He thought Junior had moved into a dormitory, but he did not know. Williams testified that "Willie Monroe, Derwood Minor, Marcus Bush, Michael Taylor, Jessie Anderson" and other friends of Junior's would come to his house and go back to Junior's room, all disputed by these friends who testified.
Mrs. Julia Williams testified that Junior lived with them from February until May, 1987, and that he would bring his friends there to visit, eating there, and staying an hour or so. She testified that Michael Taylor and Ted Hubbard were two of the friends who visited there. On cross-examination she was not quite certain it was in May when he left. When he left she did not know whether he moved back in with his mother or not.
Following the hearing the chancellor rendered a bench opinion. The chancellor found that Williams forged the name of Mary Williams, Nedra Williams and Mechell Williams on the release and forged their names on the endorsement of the check from Aetna, but that the affidavits were not forged, and therefore there had been no fraud in obtaining payment of the claim.
The chancellor found that Junior was principally a member of his mother's household. He further found, however, that Williams had a relationship with his son, bought a car for his son, gave his son money, had his son on his hospitalization policy, and until 1987 claimed his son as a dependent on his tax return. He further found that the son "had a room in each residence  that of the mother and the father  in which he regularly kept clothes and other personal belongings."[4]
The chancellor accordingly dismissed Aetna's claim, but did remove Williams as administrator of the estate.

LAW
The majority does not favor us with a definition of "residence." This Court has done so, however, and in an automobile liability insurance policy decision:
The word "resident" means one having more than physical presence. The transient visit of a person for a time to a place does not make him or her a resident while there. The word "resident" imports a fixed abode for the time being, as distinguished from a place of temporary abode of a temporary sojourn.
Goens v. Arinder, 248 Miss. 806, 811, 161 So.2d 509, 511 (1964).[5]

WAS JUNIOR A RESIDENT OF HIS FATHER'S HOUSEHOLD?
My quarrel with the majority begins with the fact that Junior was not living with his father and was not a member of his father's household when he was killed. If he had lived there just a part of the time, just a tiny fraction of the time on any permanent or settled basis, I might feel otherwise. But that simply was not the case. He never lived with his father.[6]
*1016 Mrs. Mary Frances Williams and Nedra, both of whom were represented by able attorneys, and both of whom knew they stood to lose several thousand dollars by their testimony, testified that Junior never lived with his father. At most, Junior had upon rare occasion spent the night there. Four of his close personal friends, who were in and out of the Mary Frances Williams home at 59 Bennett Drive several times a week from 1986, until his death, never knew of Junior spending a night with his father.
The only contradictory testimony came from Williams, whose credibility was undermined by his dishonest conduct and personal interest in this case. His claim for benefits was deceitful. He forged the names of his former wife and daughters to the release, and also endorsed their names on the $20,000 check from Aetna; and, after paying his attorney, he pocketed the remaining $13,334, most of which was their money. Williams obviously knew all this; he was represented by an attorney in this entire transaction.[7]
When his deposition was taken in Mrs. Williams' lawsuit with Maryland, Williams took the fifth amendment numerous times when questioned about these transactions. When Williams testified before the chancellor, he admitted that he had lied under oath at least three times during this deposition.
When one examines all the positive, unequivocal testimony and evidence that Junior never lived for any period of time with his father from two people of modest means who knew the facts and who stood to lose several thousand dollars by such testimony, and four close personal friends, in opposition to which we only have Williams, I hope my incredulity will be pardoned. Williams, an admitted forger, embezzler from his own family, and perjurer, in a trial in which he had a personal financial stake, had a reliability quotient on a scale from one to ten of about one-tenth of one percent. How anyone could believe his testimony that Junior moved in with him for two or three weeks, when the remaining evidence is positively to the contrary, escapes me.[8]
But let us for a moment concede Williams' testimony as being accurate. The longest Junior stayed with him was about two weeks, after which Junior moved out, and he did not know where he moved. If Junior did move in with him because of a huff with his mother, it was temporary and shortly abandoned, after which the uncontradicted testimony is that he lived with his mother at their home on 59 Bennett Drive until he was killed, each and every day. On the day he was killed, he called his mother at the hospital, told her he and Willie Monroe were at home cooking breakfast. From this record, the last person who saw him alive was Mrs. Williams. He came to her hospital room that Saturday night with Willie, and told her he was leaving, that he and Willie were going back home to wash some clothes and go to a concert. Williams, of course, knew Junior was living with his mother when he was killed, because he gave the information on Junior's death certificate, giving 59 Bennett Drive as his residence.
There simply is not one word of evidence that, at the time of his death, Junior was a "resident" at his father's home or a member of his father's "household."
Clearly, these words have to be stretched beyond any meaning to claim that Junior, in fact, was "living" or was a "resident" at his father's, much less being a member of his father's "household."
Aetna never contended, nor do I, that being a resident of one household is a law of physics thereby excluding any possibility of, at the same time, being a resident of another. Miller v. United States Fidelity & Guar. Co., 127 N.J. Super. 37, 316 A.2d 51 (1974). Under well-settled principles of law, however, Junior was not, in fact, at the time of his death a resident of his father's household.
Every single case cited in the majority opinion which held that, despite a minor child's being a resident of one parent's household, *1017 he could still have been a resident of the other's, under the facts of that case had some basis in fact to so hold.[9]
Other cases with facts far more favorable to the insured than here have held to the contrary[10] and denied coverage.
*1018 Every case with no more factual support than this one has held the child was not a resident of the non-custodial parent's household. I invite everyone to read them.
If the majority is holding that, under the facts of this case Junior was, on May 30, 1987, in fact, a "resident of the same household" as his father, it stands alone.

ANYWAY, FORGET THE FACTS
The majority does not rest its conclusion on any factual basis to support actual residence, however. It tells us:
A non-custodial parent is just as much a "parent" as a custodial parent and the child is still a member of his family. Consequently, the child is still a "resident" in the household of the non-custodial parent. We hold, therefore, that a child is a resident of both parents' households until he or she reaches the age of majority or becomes fully emancipated.
Majority Opinion, p. 1011.
As first noted, neither the statute nor the policy says any such thing.
I thought I had carefully read Williams' briefs on appeal and in his petition for rehearing, but I found no such contention that this is the law.
Also, I have read the amicus curia brief of the Mississippi Trial Lawyers Association (MTLA), and I found no such contention that this is the law. To be sure, Williams and MTLA strenuously argue that the facts of this case, however tenuous, made Junior, in fact, a resident of his father's household. They simply argue that because Junior had at times spent the night at his father's, his father contributed towards his support, he was on his father's company hospital policy, and he had left a shirt, a jacket and a vest, these were sufficient to constitute residency, in fact, in Williams' home. Neither was so bold as to suggest we create a fiction.
This aroused my curiosity, and I read every authority cited in the majority opinion which the majority claims as a basis for this pronouncement (footnotes 7 and 8, infra), as well as 96 A.L.R.3rd 810 and Couch on Insurance 2d, § 45:279. These authorities likewise are conspicuously silent as to any such pronouncement of law.[11] All hold that before any court will find a child of divorced parents resides in both parents' households, there must be some basis in fact; and the basis in fact, as I have above noted, has always been far greater than here.
Under the majority holding, the Legislature intended "resident of the same household," Miss.Code. Ann. § 83-11-103(b), to mean that children of a divorced father, who never sees or even cares to see any of them, are, as a matter of law, residents of his household. There is absolutely nothing about this statute suggesting such a bizarre reading.
This Court engenders little respect when we, as the majority now does, pronounce, as a principle of law, a statement that has no support  direct, indirect, or remote  from at least some statute or appellate court decision: when it comes out of the clear blue sky.
Whether well-meaning or not, in doing so we are arrogantly, blatantly, legislating, and going beyond our lawful function.[12]

THE BOX IN WHICH THE MAJORITY PUTS THE COURT

We are doomed to make a mess

When words we make meaningless
The majority opinion's short-sightedness can be easily demonstrated. Two decisions of this Court reaching opposite conclusions on the meaning of "household" and "residence" will suffice.
In Fleming v. Travelers Ins. Co., 206 Miss. 284, 39 So.2d 885 (1949), one Stewart had a liability policy with Travelers Insurance. Stewart and his wife were separated, but she *1019 continued to live in his home in New Orleans, where he had his telephone listed in his name. Stewart lived part-time in Mobile and part-time in New Orleans. Mrs. Stewart also owned a car, but it carried no liability insurance.
Stewart had a girl friend, Verla Fleming, and one day while he was driving Mrs. Stewart's car with Verla as a passenger, he had an accident and Verla was injured.
Verla sued Stewart and got a judgment. She then sought to collect under Stewart's policy with Travelers. Stewart's policy covered use of a non-owned car so long as it did not belong to someone who was a member of the same household as Stewart. Travelers denied coverage, claiming Mrs. Stewart was a member of Stewart's household.
The Fleming Court made some apt observations, but I only quote one paragraph from this well-reasoned opinion:
We are dealing with a contract of insurance. We must inquire what the parties thereto meant. Practical considerations must be given play, interpreted in the light of the purpose of the policy provision. This provision has been repeatedly held to reveal an obvious purpose to avoid a multiple coverage of several vehicles owned by members of the same family, who, by their close intimacy, may be expected to use the cars of each other without hindrance and with or without permission, thus increasing the liability of the insurer who has a right to expect each owner to contract for his own coverage. Concession is made to the casual permissive use by the insured of vehicles of other persons, whose permission may be considered episodic or not subject to abuse.
206 Miss. at 293-94, 39 So.2d at 887 (emphasis added). The Court held that Mrs. Stewart was not a member of Stewart's household.
Then, in Goens v. Arinder, 248 Miss. 806, 161 So.2d 509 (1964), we had a far stronger case of residence in the same household than today's case. Mr. and Mrs. H.C. Arinder lived in Marion County. They had two daughters, Calva Mae Arinder Stogner and Sylvia Arinder.
Calva Mae and her husband, William Earl Stogner, moved in with her parents while the Stogners' house was being constructed 200 yards down the road. Calva Mae was pregnant. William Earl worked offshore on an oil drilling rig. Mr. Arinder (Daddy) had a liability insurance policy with State Farm, and under it Mr. and Mrs. Arinder and their daughter, Sylvia, were the insureds, so long as they drove Mr. Arinder's insured automobile or any other car that did not belong to a "relative." The word "relative" was defined in the policy as follows: "a relative of the named insured who is a resident of the same household."
The Stogners also had a car, but it was uninsured.
One day Calva Mae asked her sister, Sylvia, to drive the Stogners' car to a local store on an errand. In doing so, Sylvia ran over and killed a little boy, Donald Ray Goens.
The parents of Donald Ray sued Sylvia and got a judgment. They then sued to collect under Mr. Arinder's policy. State Farm denied coverage on the ground that the Stogners were residents of the Arinder household. The circuit court agreed with State Farm, and this Court on appeal reversed and rendered.
Under the definitions clause, Mrs. Stogner was not "a resident of the same household," but only temporarily sojourning or visiting there pending completion of her new home.
248 Miss. at 813, 161 So.2d at 510.
This Court then defined "resident," as noted on page 1015, infra.[13]
Goens went on with a several-page dissertation on the meaning of "household," as well, and concluded "as a matter of law that the Stogners can not be held to be members of the household of Mr. Arinder, the assured." Goens, 248 Miss. at 815-22, 161 So.2d at 516 (emphasis added).
*1020 This Court in Fleming and Goens wisely was careful not to expand the meaning of either "resident" or "household" beyond their ordinarily-accepted meaning, and, in doing so, extended insurance coverage to protect the public  those third party victims of an uninsured motor vehicle who had no opportunity to protect themselves.
A scenario such as happened in Fleming or Goens is far more likely than what actually happened in this case.
Let us suppose in this case that we had the following facts on that fateful May 30, 1987: For some reason or another, Williams or his wife, Julia, happened to be driving Junior's car. It could have been parked there at Williams' house, and one of them needed to use it. Or, Williams could have been driving Junior's car from a shop to return it to Junior. And, while one or the other was driving Junior's car, an accident occurred. A child was run over, or there was a wreck and somebody in the other car was terribly injured. Suppose, further, that Aetna declined coverage, because  guess what?  the Aetna policy excludes coverage for use by Williams or Julia of any vehicle owned by "any resident of the same household as the named insured."[14]
I have no doubt that such a refusal by Aetna, prior to today's decision, would be deemed an unreasonable denial of coverage, subjecting that company to punitive damages. I have no trouble visualizing this Court's observing that any claim that Junior, in fact, was a resident of his father's household May 30, 1987, the time of the accident, was a manifest absurdity.
Not only that, the policy excludes liability coverage for injury to anyone "related to and living in the household of a person who is responsible for the injury."[15] This means that if Junior had been riding in his father's car as a passenger on May 30, 1987, and was injured or killed, there would have been no coverage. This Court could then have had the fun of declaring this provision void as against public policy.[16]
The majority cannot have it both ways. Or perhaps it can. It just has. Janus-like, the majority simply ignores Goens and Fleming, citing neither, and has this Court telling the world that whether or not a person is a member of the same household of the named insured depends on whose ox is being gored, the insurance carrier's or the insured's.[17]
What a pretty pass to come to. Depending on the facts of the accident, the majority subjects an insurance carrier to punitive damages for claiming the victim was a resident of the same household in one instance for and denying the same person was a resident of the same household in the other.
Just for the heck of it, go a step further. Suppose Junior had been riding as a passenger in Williams' car with stepmother, Julia, driving, and she had a wreck with an uninsured motorist. Both Julia and the uninsured motorist were negligent, and Junior *1021 was killed. Under which policy provision would the majority propose Junior's estate collect?
I cannot escape the memory of the first line of the chorus of the Air Force hymn.
Such uncertainty in the law may very well add to the income of the lawyers who engage in this type litigation, but it is difficult to envision benefit to anyone else. It goes without saying that increased exposure is passed along by increase in premium, and increased uncertain exposure is doubly or trebly passed on to the insurance-paying public.[18]
Enjoy.

WHAT THIS CASE MEANS
Recently, in Thompson v. Mississippi Farm Bureau Mut. Ins. Co., 602 So.2d 855 (Miss. 1992), in determining residency of a minor child, we used the words "residency" and "domicile" interchangeably, and held, as a matter of law, that a child is the "legal resident" of the custodial parent's household. We held that a child being transported by her mother to permanently live with her father was not residing in his household under the mother's liability policy. We had no difficulty with "residency" in that case, nor did we in Goens. "Residence" means living there on some sort of regular, settled, anticipatory basis, something beyond temporary or transitory. It is that simple. Black's Law Dictionary 1117, p. 666 (5th Ed. 1979).[19]
Fleming told us to look to the purpose of the insurance contract. One may assume that the purpose of the statute was to insure the named insured and members of his family living under the same roof full time. Or, when liberally construed, at least part of the time on a settled, anticipatory basis when a child could regularly be expected to put his or her feet under the dining table, sleep in a designated bed on a weekly (or at least monthly) basis, and had his or her personal belongings in a certain designated place. And, there was something about his or her presence that made the child a member of the family while there. This, at the most, is what the insurance company can be expected to insure under the statutory rubric "resident of the same household." Outside or beyond this, it stretches credulity, smacks of fraud, to pretend the child lived or resided there.
The majority would have us think with uninsured motorist coverage, as with liability coverage, one risks penalty if one does not take it out. That is not so. Compare Miss. Code Ann. § 83-11-101(2) with Miss. Code Ann. § 63-15-69. Uninsured motorist coverage is purely elective on the part of the insured. There is no penalty if the custodial parent chooses not to carry it, and I suspect that once this opinion becomes public, many will choose not to.
If a non-custodial parent wants to secure uninsured motorist coverage for a child who does not reside in his home  a child whom, as in this case, it assaults the intelligence to claim he did  then he should pay for it, not all the rest of us. I resent being required to take on part of this burden in paying my premium for uninsured motorist coverage. I *1022 resent being required to pay, in my uninsured motorist premium, for even non-custodial parents whose children are strangers to them. In fact, I may not be able to afford it.
The majority's egalitarianism converts liability into health and accident insurance. If a person is hurt or killed, either the facts are adjusted or we find the words of the policy take on a peculiar malleability to reach the liability grail. Look no further: if the claimant is hurt or killed, he or his estate is covered. And we expect premiums to remain at liability insurance level? I know absolutely nothing about the insurance business, but I would suppose these companies want to draw into some kind of recognizable frame who they are insuring. Otherwise, how can they gauge premiums to charge? The majority removes all boundaries.
Junior was clearly Mama's boy. On May 30, 1987, he had no intention of living anywhere but home with Mama at 59 Bennett Drive. It was from Mama that he sought approval, and Mama who he sought each day to report to and relieve from worry. His trip to Daddy's was to solicit money.
This is not a case of Junior's estate being deprived of uninsured motorist coverage, because it has it under Mrs. Williams' policy. It is a case of a bogus tacking of his father's policy as well. Junior could also have had all kinds of uninsured motorist coverage for his own car, had his father seen fit to provide it, or Junior to take it out himself. Williams elected, instead, to give his son an old car, turn him loose in it without any liability insurance to protect the public, and let his son run the risk of losing his driver's license if he had an accident with another vehicle. Miss. Code Ann. § 63-15-11 (1972). This is a case of giving added uninsured motorist coverage to someone who made no attempt to do so on his own and, if Williams had wanted Junior to have uninsured motorist coverage under his own policy with Aetna, he should have added him as a named insured and paid for it himself.
The chancellor noted that Mrs. Williams was "uncooperative" with Williams. I would not so characterize her conduct; but, rather, say it was that of a highly-principled lady who declined to engage in dishonest conduct, even though it was going to cost her and her children several thousand dollars. She knew Junior did not live and never had lived with his father, and she refused to participate in a false claim. It was that simple. She was that honorable.
We live and learn, Mrs. Williams.
I respectfully dissent.
PRATHER, P.J., and PITTMAN, J., join this dissent.
NOTES
[1] On petition for rehearing, the original opinions handed down in this case are withdrawn and this opinion is substituted therefor.
[2] While we recognize that the conduct of Hal Otis Williams, Sr. was reprehensible in this case, we do not address these facts because they do not go to the merits of the issue now before us. The chancellor properly removed Williams as administrator of his son's estate and ordered him to pay a pro rata share of the insurance proceeds to the other heirs.
[3] Compare 26 U.S.C. § 152 (1986) with the former requirements for claiming minor children as dependents.
[4] We note that Miss. Code Ann. § 11-7-13 provides that an action for wrongful death may be brought "by the parent for the death of a child" without any qualifications such as those sought by Aetna.
[1] The Code definitions, in pertinent part, provide:

As used in this article:
(b) The term "Insured" shall mean the named insured and, while resident of the same household, the spouse of any such named insured and relatives of either, while in a motor vehicle or otherwise.
Miss. Code Ann. § 83-11-103 (1972) (emphasis added).
[2] The majority gratuitously informs us that the reason Williams quit claiming Junior as a dependent was that the 1986 Tax Reform Act prevented him from doing so. Perhaps. Significantly, however, Williams never gave any such reason.
[3] Maryland had denied coverage, but not on the grounds that Junior was not a resident of Mrs. Williams' household.
[4] The "clothes" consisted of a shirt, a jacket and a vest. The record is completely silent as to when or why these three items were left in Williams' house.
[5] Also, Miss. Code Ann. § 37-103-7 (1972); Miss. Code Ann. § 23-15-11 (1972).
[6] The majority might have a point if Williams had been given part-time custody as opposed to "reasonable visitation" rights, only, in the divorce decree (Williams did not even have the right to take Junior to spend the night with him); or if Junior had, in fact, spent some time each week or each month on a regular, anticipatory basis. The nights  whenever they were  Junior spent in Williams' house were sporadic. We do not know if they were over once or twice a year, or that often.

Even during the two weeks Williams claims Junior stayed at his house, Junior was no more than a roomer, coming in at 3:00 a.m. He was no part of Williams' household. And even Williams did not testify Junior lived with him at all either before or after this two-week period.
[7] The majority does not explain the enigma of why Brown, instead of making four separate checks for equal amounts, wrote two checks  one, to Williams for $9,000.00, and one to both Williams and Nedra for $4,334.00.
[8] Williams' present wife Julia's vague testimony does not require discussion.
[9] The majority is, of course, correct when it says courts endeavor to liberally construe these policy provisions in favor of the insured, but all require some factual basis to support them.

The following are the cases, mind you, which the majority tells us support its conclusion that Junior, in fact, resided with Williams:
Child regularly stayed at father's house one or two nights every week, had clothes and other personal belongings there, had his own room, received some of his mail there, and telephone calls there. Also, father and stepmother "participated in many activities" with 13-year-old Cam. Father purchased clothing, toys and educational items for Cam.
Snedegar v. Midwestern Indemnity Co., 44 Ohio App.3d 64, 541 N.E.2d 90 (1988) (emphasis added).
If Junior had spent just one night a week on any regular basis with Williams, we might have a different story here.
A difficult child had left her home with her father to live with a boy friend. She kept telling her father, however, she intended to return and abide by his rules, and following her accident she did return home. When she moved from father's, she left her television, stereo, and clothes, all of which remained in her room. Held: she was covered under policy provision: "[w]ho is a resident of the same household as the named insured whether or not temporarily residing elsewhere."
Grange Mutual Casualty Co. v. Brinkley, 182 Ga. App. 273, 355 S.E.2d 767, 768 (1987) (emphasis original).
Italicized portion was persuasive to the Court.
Both parents testified they intended child to maintain relationship with both parents. He regularly lived with mother on week nights and with father on weekends.
Alava v. Allstate Ins. Co., 497 So.2d 1286 (Fl. Dist.Ct.App. 1986) (emphasis added); review denied, 508 So.2d 13 (Fla. 1987).
Son lived in bunkhouse 76-100 yards from parents' house on family farm. Bunkhouse had an outhouse. Bunkhouse and main house had same meter, and served by same driveway, had same address. Son ate meals, washed clothes, and watched television in parents' home.
Ferrel v. Allstate Ins. Co., 106 Idaho 696, 682 P.2d 649 (Ct.App. 1984).
Opinion silent on his utilization, if any, of outhouse. (My guess is that he used that only when absolutely necessary, especially in Idaho).
The majority cites none of them, but the cases discussed in 96 A.L.R. 3rd 810-813 holding a child a resident of both households all had definite, substantial factual bases therefor. The same holds true for Couch on Insurance 2d, § 45:279, cited by the majority.
[10] In the following cases there was more factual basis to claim the child was living in an additional household than here, yet the Court rejected the contention:

Parents were merely separated  not divorced  and adopted child lived with mother. Decedent child deemed not a resident of father's household.
Delancey v. State Farm Mut. Auto Ins. Co., 918 F.2d 491, 496 (5th Cir.1990).
Injured child of separated parents who resided in house with mother deemed not resident of same household as father, despite father's overnight visits with child in mother's home.
Davis v. Hartford Ins. Co., 456 So.2d 302 (Ala. 1984).
Teenage boy who moved into apartment with brother deemed, in fact, non-resident of father's household. Grant of summary judgment reversed on other grounds.
Mathis v. Employers' Fire Ins. Co. 399 So.2d 273, 275 (Ala. 1981).
Children in custody of and residing with mother deemed non-residents of father's household, although divorce decree required father to support the children, gave father reasonable visiting rights, and required father to provide automobile insurance. Also, father still co-owner of house in which children lived.
Gulf American Fire & Cas. Co. v. Azar, 364 So.2d 332 (Ala. Civ. App. 1978).
Nephew held non-resident relative of policyholder, although living in house owned by uncle, the policyholder, and uncle stayed in same house seven weeks out of year. Jury verdict in favor of insured reversed and rendered.
Sembric v. Allstate Ins. Co., 434 So.2d 963 (Fla. Dist. Ct. App. 1983).
Court ruled child not resident of father's household, although parents only separated for two months.
Ursin v. Oubre, 343 So.2d 1189 (La. Ct. App. 1977).
Change in status by law  here, divorce decree awarding of son to mother  deemed to make son a legal resident of only mother's household.
Chapman v. Allstate Ins. Co., 306 So.2d 414 (La. Ct. App. 1975).
Child deemed not resident of either parent's household. Residence held to be a question of fact.
American Family Mut. Ins. Co. v. Automobile Club Inter-Insurance Exchange, 757 S.W.2d 304 (Mo. Ct. App. 1988).
Father held to be non-resident of household, although he still retained title to the house, in which ex-wife and four children resided; he had some personal property in the house; he gave the address of that house when voting; and he received some of his mail, including stock dividends, at that address.
Pierce v. Aetna Casualty & Surety Co., 29 Wash. App. 32, 627 P.2d 152 (1981).
[11] Residency is always a question of fact. See Baricelli v. American Universal Ins. Co., 583 A.2d 1270 (R.I. 1990).
[12] If the majority has problems with well-accepted and established meanings of words, it should respectfully suggest the Legislature do the legislating.
[13] Compare Goens, where the child was killed while the Stogners actually were living in the Arinder home, with this case when Junior had long since moved back in with his mother. There is not even any pretense that when Junior was killed he was living with his father.
[14] The Aetna policy says:

V. ADDITIONAL DEFINITIONS
but the term "insured highway vehicle" shall not include:
... .
(ii) [a] vehicle owned by the named insured or any resident of the same household as the named insured: ... .
(emphasis added).
[15] The Aetna policy continues:

IMPORTANT NOTICE
This policy does not provide Liability Coverage for bodily injury to the "named insured." This policy also does not provide Liability Coverage for bodily injury to anyone related to and living in the household of a person who is responsible for the injury. (Emphasis added).
[16] Such provision arguably would be in conflict with the mandatory provisions of Miss. Code Ann. § 63-15-43(3) (1972), that every liability policy cover the insured for any and all injuries caused while driving the vehicle for which he was legally liable. See, also, our recent decision in Glaskox v. Glaskox, 614 So.2d 906 (1993), holding a child could sue his parent for injuries sustained from the parent's negligent operation of an automobile. It would not prevent, however, Aetna's limiting the amount which could be recovered by Junior to $10,000. Miss. Code Ann. §§ 63-15-3(j) (1972); 63-15-43(2)(b) only requires a minimum of $10,000 coverage.
[17] Is this fair play? Is it even rational?

In fact, this is precisely what MTLA intrepidly urges us to do, interpret the facts supporting "resident of same household" restrictively in situations as in Goens and expansively here. MTLA amicus curia brief, p. 7.
[18] The idea that you can "stick it to" an insurance company by broadening coverage is just that, an idea, and never a reality. A casualty insurance company is a conduit passing increased expense on to the public, plus its extra profit, plus its extra administrative costs. Who pays? We do.
[19] Miss. Code Ann. § 37-103-7 (1972) governs residency of students:

The residence of a person less than twenty-one years of age is that of the father. After the death of the father, the residence of the minor is that of the mother. If the parents are divorced, the residence of the minor is that of the parent who was granted custody by the Court... .
Miss. Code Ann. § 37-103-7 (1972) (emphasis added).
Miss.Code § 23-15-11 (1972) provides that a person 18 years of age and over wishing to vote must have "resided" in this state for thirty days, and that he shall be qualified in the county, municipality and voting precinct "of his residence." Extending the impeccable logic of the majority's interpretation of Miss. Code Ann. § 83-11-103(a), the uninsured motorist statute, to Miss. Code Ann. § 23-15-11 would have meant that if Mrs. Williams lived in Columbus and Williams in Starkville, Junior could have voted in both cities. Certainly nothing written in the Code suggests any difference in interpretation of "resident" in these statutes, much less the radical departure of the majority.