**CHARLES HAMPTON'S
A–1 SIGNS, INC.**

v.

**AMERICAN STATES INSURANCE
COMPANY.**

Court of Appeals of Tennessee,
Western Section, at Nashville.

July 12, 2006 Session.

Dec. 28, 2006.

Application for Permission to Appeal
Denied by Supreme Court
April 16, 2007.

Motion to Reconsider Denied
May 4, 2007.

William M. Jeter and Michael D. Herrin, Memphis, Tennessee, for Defendant/Appellant American States Insurance Company.

Christopher J. Pittman, Clarksville, Tennessee, for Plaintiff/Appellee Charles Hampton's A–1 Signs, Inc.

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

## OPINION

This is an insurance case. The plaintiff installs steel structures that hold billboard signs. On one of the sign structures, the sign fell from its sign pole after installation. An investigation revealed a defective weld between the sign pole and the mounting plate. A subsequent investigation indicated that all sign poles fabricated by a particular sub-contractor had similar defective welds. The plaintiff sued the sub-contractor for breach of contract on 78 structures and obtained a default judgment. The plaintiff then filed the instant lawsuit against the sub-contractor's liability insurer, alleging that it was liable under the sub-contractor's commercial general liability policy and umbrella policy. The defendant insurer filed a motion for summary judgment. The trial court granted it in part, narrowing the plaintiff's claim to the sign structures which showed physical damage. After a bench trial, the trial court found there was coverage and entered a judgment in favor of the plaintiff. We reverse, holding that physical damage arising out of and confined to the defective welds performed by the insured is not covered under either the commercial general liability policy or the umbrella policy.

The material facts in this case are not in dispute. Plaintiff/Appellee Charles Hampton's A–1 Signs, Inc. ("A–1 Signs"), contracted with Cracker Barrel Old Country Stores, Inc. ("Cracker Barrel"), to install sign structures to hold billboard signs advertising Cracker Barrel restaurants. In general, a sign structure consists of the footings, a sign pole, a mounting plate on which a sign is attached, and electrical work. In 1990, A–1 Signs subcontracted the fabrication of the sign poles to Fabri–Struct, Inc. ("Fabri–Struct"), a Missouri corporation. Fabri–Struct produced the steel structure—a sign pole with a mounting plate welded to its top—and delivered it to A–1 Signs. A–1 Signs then laid a concrete foundation, erected the steel structure, ran the electrical wiring, and affixed a Cracker Barrel sign to the mounting plate. From November 8, 1990 to August 25, 2000, A–1 Signs installed 113 sign structures at various locations throughout the United States using steel structures provided by Fabri–Struct.

On May 8, 2000, at a Cracker Barrel restaurant in Bradley, Illinois, a Cracker Barrel sign fell from its sign pole approximately one hundred feet to the ground. This caused A–1 Signs to investigate what caused the Cracker Barrel sign to fall. A–1 Signs found that Fabri–Struct had failed

to weld the mounting plate to the sign pole according to contract specifications. Consequently, a crack formed in the weld that eventually traveled the circumference of the pole. The sign then detached from the top of the pole and fell. This occurred under the force of approximately 70–mile–an–hour winds; had the weld been done according to the contract specifications, the sign structure should have been able to withstand winds of up to 110 miles an hour or more.

After the incident in Bradley, Illinois, A–1 Signs inspected a number of the sign structures welded by Fabri–Struct. A–1 Signs found that, of the 113 sign structures erected with poles fabricated by Fabri–Struct, 78 structures were dangerous and in need of repairs due to defective welds. Of these sign structures, 39 were defectively welded but showed no signs of physical damage. The remaining 39 structures, however, had cracks and stress fractures in the weld between the top of the sign pole and the mounting plate. A–1 Signs repaired all 78 structures using a machine that "gouged the [defective] weld[s] out . . . one-fourth at a time," thereby re-welding the mounting plates to the sign poles without having to remove the Cracker Barrel signs.

A–1 Signs then sued Fabri–Struct for breach of contract and breach of warranty, seeking expenses incurred in testing and repairing the 78 sign structures. Initially, Fabri–Struct's commercial insurance provider, Defendant/Appellant American States Insurance Company ("American States"), retained counsel and provided a defense to Fabri–Struct. However, American States later decided to deny coverage to Fabri–Struct for the claims asserted by A–1 Signs; consequently, on September 28, 2001, American States withdrew its defense of Fabri–Struct. Fabri–Struct did not thereafter appear, and on July 25, 2002, the trial court entered a default judgment in favor of A–1 Signs for $300,117.50, the costs A–1 Signs incurred in testing and repairing all 78 defective signs.

On September 25, 2002, A–1 Signs filed the instant lawsuit against American States. In its complaint, A–1 Signs sought a declaratory judgment that American States was legally responsible for satisfaction of the judgment previously entered against its insured, Fabri–Struct. A–1 Signs based its claim on two insurance policies provided to Fabri–Struct by American States: a Commercial General Liability policy ("commercial liability policy") and an accompanying Umbrella policy. The insuring agreement of the commercial liability policy reads, in pertinent part:

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

\* \* \*

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an occurrence" . . .; [and]

(2) The "bodily injury" or "property damage" occurs during the policy period.

Similarly, the Umbrella policy states:

[W]e will pay those sums that the insured becomes legally obligated to pay as "ultimate net loss" . . . because of:

A. "Bodily Injury" or "property damage," . . .

\* \* \*

which takes place during the policy period and in the policy territory and is caused by an "occurrence."

Generally, these policies provide coverage for "property damage" caused by an "occurrence." In both policies, "property damage" is defined as:

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Although each policy defines "occurrence" slightly differently, under both policies the term generally means an "accident, including continuous or repeated exposure to substantially the same general harmful conditions."

On January 4, 2004, American States filed a motion for summary judgment. Both parties agreed that the issues were governed by Missouri law.[1] In its motion, American States asserted that the claims were governed by exclusions from coverage in both policies, relying primarily on section I.2.m(1) of the commercial liability policy and section III.J.1 of the Umbrella policy. These exclusions are identical in each policy. Both sections state that the following is excluded from coverage:

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

    (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or

    (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

In short, the policies do not cover "property that has not been physically injured" where the loss arises out of a defect or deficiency in the insured's product or work. Based on these exclusions, American States asserted in its motion for summary judgment that the policies did not cover the costs of repairs arising out of Fabri-Struct's failure to follow specifications in welding the mounting plates to the sign poles where the sign structures—the pole, mounting plate, sign, and electrical work—were not physically injured.

In its response to the motion for summary judgment, A–1 Signs conceded that there was no coverage under the insurance policies for the 39 sign structures that, although defectively welded, did not show cracks or stress fractures at the time A–1 Signs repaired them. It asserted, however, that the remaining 39 sign structures that showed cracks and stress fractures in the weld at the time of repair were "physically injured," triggering coverage.

On April 28, 2004, American States filed a reply asserting that, even if the cracks

---

1. The motion for summary judgment, the parties' later responses, and the subsequent bench trial, were argued under the law of Missouri. Both parties stipulated that because the policies were purchased and delivered in Missouri, the law of Missouri governed the substantive issues of insurance coverage. This Court agrees. In Tennessee, absent a valid choice of law provision, the rights and obligations under an insurance policy are governed by the law of the state where the insurance policy was "made and delivered." *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973).

and stress fractures in the welds of the 39 sign structures at issue constituted "physical injury" to the unit as a whole, the policies still excluded coverage. American States argued that the "physical injury" occurred to "impaired property," that is, property other than the insured's made "less useful" because of the insured's product or work, or the insured's "failure to fulfill the terms of [the] contract." As with "property that has not been physically injured," it contended, coverage is excluded for damage to "impaired property" arising out of a "defect, deficiency, inadequacy or dangerous condition" in the insured's product or work. Therefore, American States averred that, regardless of whether there is physical injury, the policies do not provide coverage.

After reviewing the pleadings and hearing the arguments of counsel, the trial court granted American States' motion for summary judgment as to the 39 sign structures that "the Plaintiff indicate[d] ... to have not suffered any physical damage," and denied it as to the remaining 39 sign structures. Following the trial court's order, American States applied for permission for interlocutory appeal, pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. This Court denied the application, and the case was set for a bench trial, which occurred on May 16, 2005.

At trial, A–1 Signs presented the testimony of Charles Hampton, the owner and president of A–1 Signs, who outlined the steps taken by A–1 Signs after the Cracker Barrel sign in Bradley, Illinois fell from its sign pole. He testified about the inspections of the other sign structures worked on by Fabri–Struct, the method and machinery used to repair the defective welds, and the expenses A–1 Signs incurred. Other witnesses testified as to the cracks and stress fractures that appeared in the welds of 39 of the 78 sign structures repaired. They acknowledged that the deficient welds arose out of Fabri–Struct's failure to perform "full pin" or "full penetration" welds as specified in its contract with A–1 Signs.

A–1 Signs also presented the testimony of a risk management consultant, who opined that there was coverage under the commercial liability and Umbrella policies, despite the "property not physically injured" and "impaired property" exclusion provisions, section I.2.m.(1) of the commercial liability policy and section III.J.1 of the Umbrella policy. The risk management consultant relied on an exception to the exclusions which reads: "This exclusion does not apply to the loss of use of other property arising out of a sudden and accidental physical injury to '[the insured's] product' or '[the insured's] work' after it has been put to its intended use." Without further explanation, the consultant asserted that the policies "take away the coverage, but with the exception, they put that [coverage] back in."

American States called no witnesses and put on no proof. American States asserted that A–1 Signs did not meet its burden on the issue of coverage, in that A–1 Signs' proof did not show "property damage" caused by an "occurrence."

At the conclusion of the trial, the trial court announced its oral ruling in favor of A–1 Signs. The trial court first acknowledged that the case involved a defective product, the cracks and stress fractures being a "manifestation of the defective product." Based on this theory, the trial court found, there would be no coverage. It observed, however, that "American States Insurance reaped a huge benefit ... in reducing their risk of loss by A–1 Signs going out and making these repairs." On this basis, the trial court ruled in favor of A–1 Signs, finding that it would be "unfair for A–1 to bear the total cost of

these repairs when [American States] reaped such a great benefit from making the repairs." On May 27, 2005, a judgment was entered, consistent with the trial court's oral ruling, granting A–1 Signs $72,640.00 in damages for costs incurred in testing and developing a method to fix the sign structures. An additional $152,288.33 was awarded for costs expended in repairing the 39 sign structures that had cracks and stress fractures in the welds. After pre- and post-judgment interest was added, the damages awarded A–1 Signs totaled $324,937.59. From this order, American States now appeals.

On appeal, American States raises three issues for review: (1) whether, pursuant to Missouri law, there was coverage under the commercial liability policy and the attendant Umbrella policy where the insured's defective welding resulted in cracks and stress fractures to the welds of 39 sign structures, which were later repaired without physical damage to any other aspect of the sign structure; (2) whether cracks and stress fractures in the defective welds between the sign pole and mounting plate constitute damage to "other property" when the sign pole and mounting plate had been incorporated into the completed sign structures; and (3) whether A–1 Signs met its burden of proof on the issue of coverage under American States' commercial liability and Umbrella policies.

■■■■ Although Missouri law governs the interpretation of the insurance policies in this case, procedural matters, including the standard of review, are governed by Tennessee law. Accordingly, this Court reviews the trial court's findings of fact *de novo* upon the record, accompanied by a presumption of correctness, unless the preponderance of the evidence demonstrates otherwise. Tenn. R.App. P. 13(d); *Pyburn v. Bill Heard Chevrolet,* 63 S.W.3d

351, 356 (Tenn.Ct.App.2001) (citing *Brooks v. Brooks,* 992 S.W.2d 403, 404 (Tenn. 1999)). We review the trial court's legal conclusions, however, *de novo,* without any presumption of correctness. *Pyburn,* 63 S.W.3d at 356 (citing *Nelson v. Wal–Mart Stores, Inc.,* 8 S.W.3d 625, 628 (Tenn. 1999)). In general, the interpretation of an insurance policy is a question of law and not fact. *Standard Fire Ins. Co. v. Chester–O'Donley & Assocs., Inc.,* 972 S.W.2d 1, 5–6 (Tenn.Ct.App.1998).

■■■■ Our review of the insurance policies is guided by the following principles and rules of construction, common to both Missouri and Tennessee. When interpreting a contract of insurance, the terms of the policy are read in the context of the whole policy. *Shaffner v. Farmers Mut. Fire Ins. Co.,* 859 S.W.2d 902, 906 (Mo.Ct. App.1993); *Standard Fire Ins.,* 972 S.W.2d at 7. The policy is a contract, and like any other contract, must be given effect according to the plain and ordinary meaning of the terms used. *Rice v. Fire Ins. Exch.,* 946 S.W.2d 40, 42 (Mo.Ct.App. 1997) (per curiam); *Am. States Ins. Co. v. Broeckelman,* 957 S.W.2d 461, 467 (Mo.Ct. App.1997); *Standard Fire Ins.,* 972 S.W.2d at 7. An unambiguous insurance policy is construed according to its terms. *Am. States Ins.,* 957 S.W.2d at 465; *Standard Fire Ins.,* 972 S.W.2d at 7. If the language of the policy is ambiguous, however, it will be construed against the insurer. *Am. States Ins.,* 957 S.W.2d at 465; *Standard Fire Ins.,* 972 S.W.2d at 7. Finally, the plaintiff has the burden of proving that its damages are covered by the terms of the policy; the defendant, in turn, must establish the applicability of any exclusions on which it relies. *Am. States Ins. Co. v. Mathis,* 974 S.W.2d 647, 649 (Mo.Ct.App.1998); *Massachusetts Mutual Life Ins. Co. v. Jefferson,* 104 S.W.3d 13, 22 & n. 10 (Tenn.Ct.App.2002).

We first address whether the commercial liability and Umbrella policies cover the losses sustained in relation to the 39 defective welds that cracked and fractured prior to being repaired. Aside from any exclusions that may apply to exempt coverage, this issue requires a determination of whether an event triggered coverage in the first place. *See, e.g.,* Steven Plitt et al., 9A Couch on Insurance § 129:1 (3d. ed.2006) (citing *Hawkeye–Security Ins. Co. v. Davis,* 6 S.W.3d 419, 427 (Mo. Ct.App.1999)). The policies at issue provide coverage for "property damage" caused by an "occurrence." "Property damage" is defined as physical injury to tangible property and/or loss of use of that property. "Occurrence" is defined as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." The term "accident" is not defined in the policies, but Missouri courts define it by its ordinary meaning:

> An event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event. Hence, often, an undesigned and unforeseen occurrence of an afflictive or unfortunate character; a mishap resulting in injury to a person or damage to a thing; a casualty; as, to die by an accident.

*Am. States Ins. Co. v. Mathis,* 974 S.W.2d 647, 650 (Mo.Ct.App.1998).

As pointed out by both parties, the Missouri Court of Appeals recently decided two cases involving insurance policies virtually identical to those in question in this appeal. *See Hawkeye–Security Ins. Co. v. Davis,* 6 S.W.3d 419 (Mo.Ct.App.1999); *Am. States Ins. Co. v. Mathis,* 974 S.W.2d 647 (Mo.Ct.App.1998). In these cases, the commercial general liability insurers brought declaratory judgment actions to determine whether coverage extended to damages that arose from the insured parties' breach of contract. *Hawkeye–Securi-ty,* 6 S.W.3d at 421; *Mathis,* 974 S.W.2d at 648. In *Hawkeye–Security,* the insured failed to build a home in a workmanlike manner and in accordance with contract specifications. *Hawkeye–Security,* 6 S.W.3d at 421. In *Mathis,* the insured improperly installed duct banks, which were intended to hold conduit, cable, and wire for an integrated electrical system, and failed to install rebar to reinforce the duct banks as required under the contract. *Mathis,* 974 S.W.2d at 648. Judgments were entered against the insured parties in the underlying actions based, in relevant part, on the cost of correcting the faulty work. *Hawkeye–Security,* 6 S.W.3d at 422; *Mathis,* 974 S.W.2d at 648–49. In both cases, the Missouri Court of Appeals found that a breach of contract is not an "occurrence" or "accident" under the standard form commercial general liability policy, stating: "Performance of [the] contract according to the terms specified therein was within [the insured contractor's] control and management and its failure to perform cannot be described as an undesigned or unexpected event." *Hawkeye–Security,* 6 S.W.3d at 426 (quoting *Mathis,* 974 S.W.2d at 650) (alterations in original).

In this case, unlike *Mathis* and *Hawkeye–Security,* the work performed by the insured, the welds, cracked and fractured as a result of the insured's failure to follow specifications. Assuming, without deciding, that such cracks or stress fractures would constitute "property damage" under the commercial liability and Umbrella policies in question, we must determine whether these events constitute an "occurrence" within the meaning of the policies.

In doing so, we look again to *Mathis,* in which the Missouri Court of Appeals observed: "a standard form commercial general liability policy ... insures certain property damage caused by accident to

the property *of others."* *Mathis,* 974 S.W.2d at 649 (emphasis added). "The intent of such policies is to protect against the unpredictable and potentially unlimited liability that can result from accidentally causing injury *to other persons or their property."* *Id.* (citing *Columbia Mutual Ins. Co. v. Schauf,* 967 S.W.2d 74, 78 (Mo. 1998)) (emphasis added). The *Mathis* court further noted:

> It is not the function of the CGL policy to guarantee the technical competence and integrity of business management. The CGL policy does not serve as a performance bond, nor does it serve as a warranty of goods or services. It does not ordinarily contemplate coverage for losses which are a normal, frequent or predictable consequence of the business operations.

*Mathis,* 974 S.W.2d at 649 (quoting James T. Hendrick & James P. Wiezel, *The New Commercial General Liability Forms—An Introduction and Critique,* 36 Fed'n Ins. & Corp. Couns. Q. 319, 322 n. 6 (Summer 1986)).

Applying this reasoning to the "occurrence" determination, numerous courts in other jurisdictions have held that faulty workmanship, where the only property damage that results is to the work product itself, does not constitute an "occurrence." *See, e.g., Am. Home Assurance Co. v. AGM Marine Contractors, Inc.,* 379 F.Supp.2d 134, 136 (D.Mass.2005) (finding that property damage confined to the defectively installed floating docks was not an "occurrence"); *Indiana Ins. Co. v. Hydra Corp.,* 245 Ill.App.3d 926, 185 Ill.Dec. 775, 615 N.E.2d 70, 73–74 (1993) (finding

that cracks in the floor and loose paint were the "natural and ordinary consequences" of defective installation and the wrong type of paint, and not an "occurrence"); *Heile v. Herrmann,* 136 Ohio App.3d 351, 736 N.E.2d 566, 567–68 (1999) (finding the property damage alleged, such as deterioration of the driveway, related solely to the insured's work and did not constitute an "occurrence"); *L–J, Inc. v. Bituminous Fire and Marine Ins. Co.,* 366 S.C. 117, 621 S.E.2d 33, 36–37 (2005) (finding that "alligator cracking" in a defectively constructed road system was not an "occurrence").

A–1 Signs contends that once the defective welds were integrated into the completed sign structures, which were the product of A–1 Signs, the subsequent physical injury to those welds constituted property damage to "other property," A–1 Signs' property, and would therefore be an occurrence.[2] We disagree. The reasoning proposed by A–1 Signs would effectively turn the commercial general liability policy into a performance bond, contrary to the Missouri court's admonition in *Mathis.* Under the analysis utilized by the Missouri Court of Appeals in *Mathis* and *Hawkeye-Security,* we must conclude that the cracking and fracturing of the defectively performed welds did not constitute "occurrences," but, instead, were the normal and predictable consequences of the insured's failure to perform the contract according to specifications. Therefore, coverage under the policies was not triggered.

Consequently, we find that the damage caused by Fabri–Struct's failure to perform the welds according to contract specifications was not caused by an "oc-

---

**2.** To support this theory, A–1 Signs relies on *Esicorp, Inc. v. Liberty Mut. Ins. Co.,* an Eighth Circuit opinion applying the law of Missouri to a standard form commercial liability policy. 266 F.3d 859 (8th Cir.2001). *Esicorp,* however, is inapplicable because it

dealt exclusively with the issue of "property damage," expressly noting that it was not addressing the issue of whether any property damage was caused by an "occurrence." *Id.* at 861 n. 1.

currence" under either the commercial liability or Umbrella policies. Accordingly, we hold that A–1 Signs' damages are not covered under either the commercial liability or Umbrella policies. Any remaining issues are pretermitted by this holding.

The decision of the trial court is reversed. Costs on appeal are assessed against Plaintiff/Appellee A–1 Signs, for which execution may issue, if necessary.