# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 19, 2012 Session

## COTTON STATES MUTUAL INSURANCE COMPANY v. JAMI McNAIR TUCK, ET AL.

**Direct Appeal from the Chancery Court for Lincoln County**
**No. 13374      J. B. Cox, Chancellor**

---

**No. M2011-02445-COA-R3-CV - Filed November 8, 2012**

---

An insurance company filed a declaratory judgment action seeking a declaration that mother and child were residents of the insured's household, and therefore, that coverage for the death of the child was excluded by the relevant homeowner's insurance policy. The chancery court found that mother and child were *not* residents of the insured's household at the time of the child's death, and we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

David L. Franklin, Chattanooga, Tennessee, for the appellant, Cotton States Mutual Insurance Company

J. Allen Brinkley, Derek W. Simpson, Huntsville, Alabama, for the appellees, Jamie McNair Tuck, et al.

**OPINION**

## I.  FACTS & PROCEDURAL HISTORY

This case arises out of the tragic death of a young child.  Jeffrey Chad McNair ("Chad") and Jami McNair Tuck[1] ("Jami") were married on April 17, 2004.  Two children were born to the marriage: DaKota on June 15, 2005, and Ashlynne on August 27, 2007.

Chad, Jami and the children lived in a Huntsville, Alabama, apartment from March 2008 through February 2009.  Because their lease was set to expire on February 28, and their rent-to-own home was not yet available, the family moved in with Chad's step-grandparents, Olen and Patsy Gardner, in Elora, Tennessee, near the beginning of March 2009.  Chad and Jami separated, however, on March 15, 2009.[2]  Chad moved in with his mother in Owens Cross Roads, Alabama, and Jami and the children moved in with Chad's father and step-mother, Joe and Candy McNair, in Huntland, Tennessee.

On June 20, 2009, Jami left her children in the care of Candy McNair, while she traveled to a horse show in Arab, Alabama.  Candy apparently took the children to the home of her parents, Olen and Patsy Gardner, where twenty-two month old Ashlynne drowned in a swimming pool.

Jami "made a claim" against Olen and Patsy Gardner, and the Gardners' insurer, Cotton States Mutual Insurance Company ("Cotton States") settled the claim for $150,000.00.[3]  Thereafter, Jami and Chad sued Candy McNair, in the Lincoln County, Tennessee, Circuit Court, alleging negligent supervision and wrongful death, and seeking $1,000,000.00 in damages.

Cotton States, which also insures Candy McNair, filed a Complaint for Declaratory Judgment seeking a determination of Candy McNair's coverage under her homeowner's

---

[1]Jami is currently married to Richard Tuck.

[2]Jami filed for divorce in Madison County, Alabama, on March 31, 2009, claiming that she and Chad had been residents of Madison County, Alabama, for the preceding six months.  Chad and Jami ultimately divorced on December 18, 2009.

[3]According to Cotton States' brief, the claim against the Gardners was settled before a lawsuit was filed.

insurance policy, which excluded liability coverage for "'Bodily injury'[4] to any 'insured[,]'" and which defined "insured" as follows:

> "Insured" means:
> **a.** "You" and *residents of "your" household* who are:
> **(1)** "Your" relatives; or
> **(2)** Other persons under the age of 21 and in the care of any person named above.

(emphasis added). Cotton States claimed that Jami and Ashlynne were "residents" of Candy's household on June 20, 2009, when the drowning occurred, and therefore, that the policy did not provide coverage for Ashlynne's death.

A trial was held in the Lincoln County Chancery Court on September 10, 2011. Thereafter, the trial court entered an Order[5] on October 11, 2011, finding that Jami and Ashlynne were *not* residents of Candy's household at the time of Ashlynne's death, and therefore, that coverage was provided under the policy at issue. Cotton States timely appealed.

## II. ISSUE PRESENTED

The sole issue presented on appeal is whether the trial court erred in finding that Jami McNair and Ashlynne McNair were not residents of Candy McNair's household at the time of Ashlynne's death on June 20, 2009. For the following reasons, we affirm the decision of the chancery court and we remand for further proceedings consistent with this opinion.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. **Tenn. R. App. P. 13(d) (2011)**; ***Bogan v. Bogan,*** 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. ***Watson v. Watson,*** 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.,* 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.,* 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of the issues in a case depends upon the truthfulness of

---

[4]There is no dispute that Ashlynne's drowning constituted a "bodily injury."

[5]The Order incorporated the trial court's oral ruling from the bench.

witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC,* 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Id.* When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. *Ganzevoort v. Russell,* 949 S.W.2d 293, 296 (Tenn. 1997) (citing *Kemp v. Thurmond,* 521 S.W.2d 806, 808 (Tenn. 1975)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.,* 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)). "'In general, the interpretation of an insurance policy is a question of law and not fact.'" *Metro. Prop. and Cas. Ins. Co. v. Buckner*, 302 S.W.3d 288, 295 (Tenn. Ct. App. 2009) (quoting *Charles Hampton's A-1 Signs, Inc. v. Am. States Ins. Co.*, 225 S.W.3d 482, 487 (Tenn. Ct. App. 2006)).


## IV. DISCUSSION

The sole issue on appeal is whether Cotton States is required, under Candy McNair's homeowners' insurance policy, to extend coverage for the death of Ashlynne McNair. If Jami and Ashlynne McNair were residents of Candy McNair's household at the time of Ashlynne's death, coverage is excluded; if, however, Jami and Ashlynne were *not* residents of Candy McNair's household at the time of Ashlynne's death, coverage is required.[6]

As stated above, the policy at issue excluded liability coverage for "'Bodily injury' to any 'insured.'" It defined "insured" as follows:

> "Insured" means:
> **a.** "You" and *residents of "your" household* who are:
>     **(1)** "Your" relatives; or
>     **(2)** Other persons under the age of 21 and in the care of any person named above.

(emphasis added). The policy does not define the phrase "residents of your household[,]" but the phrase "'has appeared often in insurance contracts, has been construed frequently, and is not ambiguous.'" *Tuturea v. Tenn. Farmers Mut. Ins. Co.*, No. W2009-01866-COA-

---

[6]Cotton States concedes that if Jami was a "resident" of Candy McNair's household, that she was also an "insured" under Candy McNair's homeowner's policy.

R3-CV, 2010 WL 2593627, at *9 (Tenn. Ct. App. June 29, 2010) (quoting *Nat'l Ins. Ass'n v. Simpson*, 155 S.W.3d 134 (Tenn. Ct. App. 2004)).

The phrase "residents of your household" is "'necessarily elastic,'" but a non-exhaustive list of factors is relevant to the determination of whether a person is included within such class:

> (1) the person's subjective or declared intent to remain in the household either permanently or for an indefinite or unlimited period of time, (2) the formality or informality of the relationship between the person and the other members of the household, (3) whether the place where the person lives is in the same house or on the same premises, (4) whether the person asserting residence in the household has another place of lodging, and (5) the age and self-sufficiency of the person alleged to be a resident of the household.

*Id.*[7] (quoting *Simpson*, 155 S.W.3d at 139-40). "Residence in a household contemplates both a relationship to a place and membership in a group." **Simpson**, 155 S.W.3d at 139 (citations omitted) (finding siblings were residents of the same household where they shared a house–which was their only dwelling place–as well as household expenses, and no evidence was presented that any sibling considered the arrangement temporary). "It includes the common types of close relationships, varying greatly in detail, where persons live together as a family in a close knit group, usually because of close relationship by blood, marriage, or adoption, and deal with each other intimately, informally, and not at arm's length." *Id.* (citing *Quinlan v. Coombs*, 105 Wis.2d 330, 314 N.W.2d 125, 127 (1981)). As stated by the middle section of this Court,

> Residence in a household requires a degree of permanence and intention to remain in the household for an indefinite period of time. It connotes a settled or permanent status. Thus, a temporary visit by a relative does not make the relative a resident of the household because it is temporary and there is no melding of the family unit.

---

[7]In *Tuturea*, this Court determined that Wife was a resident of Husband's household although the two maintained separate residences. 2010 WL 2593627, at *9. We noted that when Husband became ill, Wife moved most of her belongings to Husband's home, including her bedroom furniture, the vast majority of her clothing, and cooking utensils. *Id.* Wife also moved her dogs into Husband's residence and Wife testified that "if I moved the dogs over there, that meant that I was going to be there full time, because if the dogs were there, I was there." Further, Wife testified that her separate residence served only as a "warehouse" which she checked on "once in a while[,]" and witness testimony confirmed that Wife had stayed primarily at Husband's residence since his illness began. *Id.*

*Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Smith*, 206 Va. 280, 142 S.E.2d 562, 565-66 (1965)).

Significant evidence was presented in this case regarding Jami and Ashlynne's living arrangements prior to June 20, 2009. Chad, Jami, and the children lived in a Huntsville, Alabama, apartment until their lease expired at the end of February 2009. The family then placed all of their belongings, with the exception of half of their clothing and some personal items, into two storage units in Alabama, and they moved into the home of Chad's step-grandparents, Olen and Patsy Gardner, with the intent to remain there until the home they expected to lease-purchase became available. However, on March 15, 2009, Jami and Chad separated, and Jami and the children moved to the home of Chad's step-mother, Candy McNair, in Huntland, Tennessee, and Chad moved in with his Mother in Owens Cross Roads, Alabama.

Jami and Ashlynne's whereabouts beginning mid-March 2009 are somewhat difficult to discern. Jami testified in her deposition that after moving into Candy's home, she and Ashlynne stayed there "[a]bout a week[,]" before they left to stay with Jami's grandparents, Randolph and Edna Scott,[8] also in Huntland, Tennessee, where she stayed for "close to about a week to two weeks." After leaving the Scotts' home, Jami stated that she traveled to Merdianville, Alabama, to stay at the home of her friend, Rebecca, for "maybe two or three days."

Jami testified in her deposition that between April 15, 2009 and May 15, 2009, she and the children stayed "[m]aybe three . . . or four days" at Candy's. At the beginning of May, Jami and the children returned to Rebecca's home, where they stayed the entire month of May with the exception of "[m]aybe like a night[.]" After leaving Rebecca's, Jami and the children returned to Candy McNair's home, where they stayed for "about a week" before again traveling to the Scotts' home for "about a week." She claimed that during the month of June 2009, she and the children stayed "maybe four or five days" at Candy's. Overall, Jami stated that between March and June 2009, she and the children stayed at Candy's "probably between five and ten days per month[,]" and that the remainder of the time, they stayed with the Scotts.

However, at trial, Jami testified that after moving to Candy's home in mid-March 2009, she stayed "maybe a week" before moving to a friend, Brianne's house in Kelso, Tennessee; but, she also testified that she stayed at Candy's home from March 15, 2009 through the end of April 2009, when she and the children left to spend the month of May with Rebecca. In contradiction of her deposition testimony, Jami stated that between March

---

[8]Randolph Scott is Jami's step-grandfather.

15, 2009 and June 20, 2009, she and the children stayed at the Scotts' home only "a night or two[.]" According to Jami, after Ashlynne's death, she and DaKota stayed with the Scotts for two to three nights before returning to Candy's until the end of July 2009. Thereafter, Jami spent periods living in a rented trailer, and living with her now-husband's parents before ultimately purchasing her own trailer in Huntland near her grandparents in February 2010 where she now resides with her husband.

Jami's grandmother, Edna Scott, testified at trial that between Jami and Chad's separation on March 15, 2009 and Ashlynne's death on June 20, 2009, Jami and the children stayed in the Scotts' home only "three to four" nights. Similarly, Randolph Scott testified by deposition that, between March 15 and June 20, Jami and the children stayed "a night or two" at the Scotts' home; he stated that they stayed at Candy's "for the most part."

In her deposition, Candy McNair stated that between March 15, 2009 and June 20, 2009, Jami and the children would leave her home to stay at the Scotts' "for a couple of days" or "more than that[.]" Candy testified that Jami "would go and she would stay a couple of days here with me, a couple of days with her grandmother, a couple of days with Rebecca." She stated that between March 15, 2009 and the end of 2009, that Jami stayed at her home "at least ten nights per month." She claimed that during some months Jami "didn't stay [any] more than a couple of days with me. . . . And then there were some[]times that she would stay probably more than ten days with me in a month." At trial, though, Candy conceded that she had no reason to disagree with Edna Scott's testimony that Jami and the children only stayed with the Scotts one night between March 15 and June 20.

Chad McNair testified at trial regarding his belief that Jami and the children moved between the homes of Candy, the Scotts, and Rebecca between March 15 and October 1, 2009. He stated that when he called Candy's home to speak with his children, sometimes Jami and the children were there, other times they were not.

In this case, much testimony was also elicited regarding the anticipated length of Jami's and the children's stay in Candy McNair's home. The undisputed evidence indicated that Jami did not intend the stay to be permanent.

> In an affidavit, Jami stated as follows:
> Chad and I split up on March 15, 2009. We had been staying at his grandparents' house up until then. I took the two children and began staying at Candy McNair's house some; then we would stay at my grandparents' house some; and I would also stay at my best friend, Rebecca's house because I was unsure what to do. Our furniture was in storage. My clothes were at Candy's house and my grandparents' house. I washed clothes at both places.

. . . I appreciate Candy and Joe, my grandparents, and Rebecca letting us stay there during this period of transition. We were broke and desperate. There was nothing settled about this situation. It was only temporary. I never had any intention, nor did my hosts, of my staying at these places on a permanent basis.

At trial, Jami testified that she "was in and out of Candy's house." She described the arrangement as temporary in nature, because, as she stated, "I wanted to find me a job, buy me a house and move me and my kids by ourselves." Jami also noted her intention to move to the Scotts' home once upstairs bedrooms were prepared for her and the children. Moreover, she acknowledged a very close parent/child-like relationship between herself and the McNairs, but she testified that she never asked to live with them permanently, nor had they asked her to do so. She stated that her divorce from Chad was her first, and she agreed that it had "left her whole life in a state of flux[.]" According to Jami, her belongings remained in storage until February 2010, her clothing was scattered between Candy's home and the Scotts' home, and although her children shared a bedroom at Candy's house, she was forced to sleep on a couch. Jami acknowledged that she provided Candy's address as her own when seeking a TennCare application, but she stated that when she completed the application, she provided the Scotts' address as her own. She stated that, with the exception of the TennCare application, the only mail she received at Candy's was "junk mail." At trial, Jami and Chad submitted into evidence Jami's "Affidavit of Substantial Hardship and Order" and "Child Support Information Sheet" from her divorce case and a "Certificate of Title," all dated March or April 2009, listing Jami's address as the Scotts' Huntland address.

> At trial, the following exchange occurred between Jami and Cotton States' counsel:
> Q: And when you moved in [to Candy's house], you intended to live there indefinitely, didn't you?
> A: Yes, sir.
> Q: Until you could find a place to live?
> A: Yes, sir.
> . . . .
> Q: But during this period of time in May, you've already told us that you had intended to live with Candy and Joe indefinitely?
> A: Correct.
> Q: All right. Until you found your own place?
> A: Correct.

Jami further agreed that the McNairs' home was her "residence" during the period in question and that "Joe's and Candy's house[] was the place that wherever [she] went, to Rebecca's house, to the Scotts' house, to the Gardners' house, that [she] intended to return

to as [her] home[.]"

At trial, Cotton States also introduced into evidence a CD recording, and written transcript thereof, of a telephone interview between a Cotton States' Liability Specialist and Jami McNair, which included the following exchange:

Q: Okay (Pause) alright so when were you planning on, I, I mean were you planning on moving out  [of Candy's house] or are you there indefinitely?
A: I'm here until I, I'm not sure when, ha, ha, ha.
Q: Okay so it's kind of indefinite- - -
A: Yes.

Jami indicated her understanding that the conversation was being recorded and she agreed that her answers were "true and correct to the best of [her] knowledge and recollection[.]"

Candy McNair testified, at trial, that she never intended for Jami and the children to live with her permanently, and that she had not asked them to do so. Instead, she characterized Jami and the children's living situation as "back and forth" and "between [] two places," and she agreed that she and her husband were only allowing them to stay "as house guests for a little while."  Candy testified that she did not require Jami, who was unemployed, to sign a lease or to pay rent during her stay, nor did Jami contribute any money to her living expenses there.  She stated, "I had no intention of them moving in as residents, but I had no intention of them living on the street either.  They had to have a place to live."  However, at trial, Candy agreed that Jami was a "resident" of her home during the period in question and she acknowledged that she would have allowed Jami and the children to stay with her until they were able to find a home of their own. Additionally, Cotton States introduced a CD recording, and transcript of, a telephone conversation between its Liability Specialist and Candy, which included the following exchange:

A: [Ashlynne's] dad's name is Jeffery Chad McNair, her mother's name is Jami Nicole McNair.
Q: And what is their address?
A: They are [] legally separated, I'm not sure of the dad's address, but mom lives with me at 52 Keith Road, Huntland, Tennessee 37345.
Q: Okay and how long has she been a resident at . . . your address?
A: Since separation in, the end of February of 2009.[9]

---

[9]Candy acknowledged her understanding that the conversation was being recorded, and she indicated that her "answers [were] true and correct to the best of [her] knowledge and recollection[.]"

Jami's grandmother, Edna Scott, testified that Jami believed she was only moving in with Candy temporarily, until she and Chad reconciled. She stated that "we knew that if [Jami] got her own place, she would move." She further testified that Jami planned to move into the Scotts' home when the upstairs bedrooms were completed, until she was able to find a home of her own. In his deposition, Randolph Scott agreed that between March 15 and June 20, Jami was in a "period of transition" and that "she was trying to figure out where she was going to live and what she was going to do with these two children[.]"

Candy's father, Olen Gardner, testified by deposition that Jami and the children living with Candy was "[a]bsolutely temporary" and that they were "here for awhile and there while. . . . They were living [at Candy's] while they were bouncing around everywhere during this troubled time." He acknowledged that Candy's home "was their primary place they stayed, but they did go to her mom's, I think her sister's, her grandpa's. . . . [There] could have been two or three other places; they didn't say, because we were in turmoil at that time."

Candy's mother, Patsy Gardner, similarly testified by deposition that between March and October 2009, "a lot of the time[] [Jami] wasn't [at Candy's]." She stated that she visited Candy's home two to three times per week, and that Jami was there only approximately fifty percent of the time. If someone had asked her, on June 1, 2009, where Jamie lived, she "really [didn't] know how to answer that because there w[ere] times she was at Candy's, she was at Rebecca's, she was at - - You never knew where she was[.]"

As stated above, the trial court found that Jami and Ashlynne were not residents of Candy McNair's household on June 20, 2009, that the homeowner's policy at issue provided coverage to Candy McNair, and that Cotton States was obligated to defend and indemnify Candy McNair for the acts or omissions alleged by plaintiffs. From the bench, the trial court discussed the *Simpson*[10] factors outlined above, as follows:

The first, is the person's subjective or declared intent to remain in the household either permanently or for an indefinite or unlimited period of time?

There is some divergence of proof on this issue. And the Court is aware that this testimony could be seen to be self-serving by . . . one party, but it would seem to help the other party if they said something different. And, Candy's testimony and the grandmother's testimony is enough divergence there for the Court to look more closely at declared intent.

---

[10]The trial court cited *VanBebber v. Roach*, 252 S.W.3d 279 (Tenn. Ct. App. 2007), which cited the *Simpson* factors.

It says, the person's subjective or declared intent to remain in the household either permanently or for an indefinite period or unlimited period of time. Well, when you asked her, she said it was not her intent. That is an expression of her declared intent. Was not her intent to remain there permanently.

This was a temporary situation. She was in the middle of a separation from her husband; she was going to, I think in her words, find me a job, find me a place and move on with my life. That's a paraphrase, but that's pretty close to what she said. Her declared intent is not in question. Self-serving, if it is, it is still her declared intent. That's what - - one of the things that the Court is to look at.

Is that corroborated by anybody? Yes. Grandmother was working on rooms at one place; Candy was okay for her to stay at the other place; she stayed in Kelso; she stayed with Rebecca. There's clear corroboration of that declared intent that is not self-serving.

. . . .

I think this state of flux is readily apparent when you look at the record. She used Alabama for trying to get out of a bad marriage situation as an address, she used [the Scotts' address] as an address for some of her applications, she used this 52 address of Candy's for other applications. Flux, absolutely and accurately defines where she was at that time. And I think I said on summary judgment, there's a difference between staying and living. This is staying. This is definitely staying.

I think in terms of the first factor itself, that's where the Court is inclined, based upon that - - and I know that counsel has an argument that because both the witnesses said it was for an indefinite period of time, that that could be a legal argument to be made, I understand that. It was an incredible job of both witnesses. They - - but I don't have an issue with their credibility.

The mother of the deceased child, when you asked her if she lived, she said she lived. She was honest with you, when you asked her about - - when she was asked about whether her declared intent was temporary or permanent, she said it was temporary. I think she was being honest. The Court's job is to weigh credibility. And I understand that there might be a monetary reason

-11-

for that testimony, but I don't think, if there was a true monetary reason, she would have ever said she lived it if she had been coached, and I don't think she was.

Indefinite and for an unlimited period of time as contemplated by the second clause of the first factor under [*Simpson*] . . . is not the same thing as was contemplated by the parties. There is a distinction to be made from always having a home to go back to and having a residence.

Two. The formality or informality of the relationship between the person and the other members of the household. The formality was decreasing in that the marital relationship wasn't what it was, but this was still family, still grandchildren involved in this situation, still someone thought of as a daughter, leave the in[-]law part of it out, in this situation. There would be sufficient formality for a residential finding to occur if I had different facts, but it linchpins itself back to number 1.

Whether the place where the person lives is in the same house or in the same premises. Don't have that here either. We got a whole bunch of different places where she was staying. Grandmother was working on rooms for her, . . . the testimony, although, it was, in fact, at one time that she stayed one night, it was also extra testimony on examination of that witness that she stayed a separate week with her. There's no question that she stayed down in Alabama some, she stayed in Kelso some. And I think I've already said that, but I'll reiterate it for the purposes of talking about that factor.

Four. Whether the person asserting residence in the household has another place of lodging. Well, it's not the same as if she had her own lake house and her own townhouse in Jackson Hole, and everything along those lines, but it's been fairly demonstrated by the proof that there were other places for her to go. I think that cuts in a knife both ways.

. . . . The child clearly was not of sufficient legal age to have a declared intent. So the child could not declare an intent. . . .[11]

---

[11] At trial, Cotton States stipulated that Ashlynne was unable to formulate an independent residency. Throughout this case, Chad has noted that, although Ashlynne was living with Jami at the time of her death, no custody order was in place at that time. In Tennessee, a minor child of divorced parents may be considered to reside with both parents. *State Farm Fire and Cas. Co. v. White*, 993 S.W.2d 40, 45 (Tenn.
(continued...)

-12-

The child was with the mother, even though there was no court order and these decisions were the decisions of the mother. The Court is just not comfortable that they reflect such settled purpose as to be considered a residence under any definition, permanent or not.

She was staying until she got her feet on the ground. That's what the proof shows. She intended to be at Candy's until she got her a place, till she got her a job, till she got her divorce finalized. She intended to spend some of that time with the grandmother because the grandmother's always been a rock for her, she was - - one of her plans for having a place, was to have a place upstairs with her, which would have been great if that had occurred, too. That's not where we ended up, but she still ended up close proximity. And I'm sure everybody in the family's thankful for that under these circumstances.

But the expression of her residence is best seen by what she did when she had an opportunity to do that. She moved to her own place, under her own roof, not with anybody that she had a choice to be with for the purposes of taking care of raising her family. That's her expression of permanent residence based upon these facts. . . .

For all these reasons, . . . I respectfully do not believe that the plaintiff has carried its burden of proof for me to declare that there is no coverage. Therefore, I declare that coverage should apply in this situation and a defense should be made.

On appeal, Cotton States contends that the trial court erroneously required permanency in order to find residency in this case. Cotton States cites *State Farm Fire and Casualty. Co. v. Smith*, 993 S.W.2d 40 (Tenn. Ct. App. 1998), in which this Court cited a Mississippi case as follows:

Along these same lines is *Aetna Cas. & Sur. Co. v. Williams*, 623 So.2d 1005 (Miss. 1993). In *Williams*, the court stated that a person may simultaneously have multiple residences, that *a dwelling place need not be fixed or permanent to qualify as a residence, and that a temporary and transient*

_____

[11](...continued)
Ct. App. 1998). It is undisputed that between her parents' separation and her death, Ashlynne lived with Jami, and Chad did not visit her in Tennessee. Accordingly, we find that Ashlynne's residency should be determined by that of her mother, Jami.

-13-

*habitation can qualify as such. Id.* at 1010. Concluding that the minor child was a resident of both his father's household and his mother's household, the court stated:

> A non-custodial parent is just as much a "parent" as a custodial parent and the child is still a member of the non-custodial parent's family. Consequently, the child is still a "resident" in the household of the non-custodial parent. We hold, therefore, that a child is a resident of both parents' households until he or she reaches the age of majority or becomes fully emancipated.

*Id.* (quoting *Williams*, 623 So.2d at 1011) (emphasis added).

Cotton States also points to Jami's agreement that she considered the McNairs' home her "residence" and that she intended to live there "indefinitely[.]" It further notes that Candy considered Jami to be a "resident" in her home and that she acknowledged that she would have allowed Jami and the children to stay with her until they were able to find a home of their own. Additionally, Cotton States highlights Jami's close familial relationship with the McNairs, that Jami had housing alternatives but chose to live with Candy, and it argues that although Jami was an adult, because she had two children and no job, she was not self-sufficient.

We begin our analysis by considering the *Simpson* factors.[12] First, we agree with Cotton States that a forever-type permanency is not required to establish residency within a household. However, residency does require some "degree of permanence and intention to remain in the household for an indefinite period of time." *Simpson*, 155 S.W.3d at 139 (citation omitted). We decline to extend *State Farm Fire and Casualty. Co. v. Smith*, 993 S.W.2d 40 (Tenn. Ct. App. 1998) to include a "temporary and transient habitation" within the phrase "residents of your household[.]" Such inclusion was not the intent of this Court, and citation to the Mississippi case was made only to demonstrate that a child of divorced parents may reside within two households.

We acknowledge that Jami agreed on several occasions that she intended to live with Candy "indefinitely." However, we are not bound by her characterization, and importantly,

---

[12]Again, the factors include: (1) the person's subjective or declared intent to remain in the household either permanently or for an indefinite or unlimited period of time, (2) the formality or informality of the relationship between the person and the other members of the household, (3) whether the place where the person lives is in the same house or on the same premises, (4) whether the person asserting residence in the household has another place of lodging, and (5) the age and self-sufficiency of the person alleged to be a resident of the household. *Simpson*, 155 S.W.3d at 139-40.

she further clarified her statement: she intended to live there "indefinitely" *until she could find a place of her own*. This intent to remain only until other arrangements could be made was corroborated by Candy, Edna Scott, and Randolph Scott. Ultimately, it was also corroborated by Jami's conduct as, in 2010, she moved into a trailer of her own. Moreover, the evidence clearly demonstrated that Jami spent a significant amount of time away from Candy's home between her separation from Chad and Ashlynne's death. Jami moved only some clothing and personal items into Candy's home, where she slept on a couch, and she did not pay rent or contribute to her living expenses.

It appears that informality of relationship lends itself to a finding of residency within a household. ***See Simpson***, 155 S.W.3d at 139 ("[Residence in a household] includes the common types of close relationships, varying greatly in detail, where persons live together as a family in a close knit group, usually because of close relationship by blood, marriage, or adoption, and deal with each other intimately, informally, and not at arm's length."). By their own testimony, Jami and Candy enjoyed a mother/daughter-type relationship. However, due to Jami's pending divorce from Candy's step-son, the relationship was likely to change.

When Jami stayed at Candy's home, she occupied the same (and apparently the only) house on the premises. Cotton States correctly points out that housing alternatives were available to Jami, but that she, nonetheless, chose to stay with Candy a majority of the time. However, the evidence also indicated that between her separation from Chad and Ashlynne's death, that Jami stayed three to four nights with the Scotts as well as the entire month of June with Rebecca. Thus, Candy's home was not her only place of lodging. Finally, in 2009, Jami was an adult, although she was without a job and, again, she did not contribute to her living expenses at Candy's.

In this case, the *Simpson* factors are split; some weigh in favor of residency, others do not. On the whole, however, we find that the evidence in this case indicates a temporary living arrangement which was to end as quickly as the uncertainties of divorce faded, allowing alternative arrangements to be made. Although characterized as such, Jami was not living with Candy "for an indefinite period of time" so as to "connote[] a settled or permanent status." ***See Simpson***, 155 S.W.3d at 139. Instead, the circumstances here are more akin to a "temporary visit by a relative," which does not rise to residency status. In sum, we find that Jami and Ashlynne McNair were not residents of Candy McNair's household on June 20, 2009, and therefore that coverage for Ashlynne's death is provided under Candy McNair's homeowner's insurance policy with Cotton States. The judgment of the chancery court is affirmed and the case is remanded for further proceedings consistent with this opinion.

## V. CONCLUSION

-15-

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to Appellant, Cotton States Mutual Insurance Company, and its surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.